State *v.* Howard.

---

THE STATE OF VERMONT *v.* WILLIAM H. M. HOWARD;

*Criminal law.    Miscarriage.    Accomplice.    Evidence;*

It is not essential to the commission of the offence of attempting to procure the
miscarriage of a woman pregnant with child, under the 8th section of chap-
ter 108 Comp. Stat., p. 560, that the *foetus* should be alive at the time the
attempt is made.

In a criminal prosecution the testimony of an accomplice, in order to have any
weight with the jury, must be corroborated upon points material to the con-
viction, and to such an extent as, upon the whole case, to satisfy the jury
beyond a reasonable doubt of the guilt of the respondent.

Where the fact of a deceased party's going to the respondent's house for the
purpose of having him procure an abortion upon her person, was material,
it was held that the declarations of such person as to her purpose in going
there, made at the time of her departure for that place, were competent evi-
dence as part of the *res gesta*.

The question whether statements, offered as *dying declarations*, are admissible
as such, is to be decided solely by the court.

The state of health or feelings of a person, when material, may be proved by
such person's statements in regard to them made at the time.

State v. Howard.

INDICTMENT in six counts. The first three counts charged the respondent with attempting to procure the miscarriage of Olive Ashe by means of instruments, in consequence of which she died. The fourth and fifth counts charged the same attempt by means of poisons and noxious things, with a similar result, and the sixth count charged the crime of manslaughter by causing the death of the said Olive by wounding her with instruments in the womb.

The respondent pleaded not guilty, and the cause was tried by jury at the January Term, 1859, in Orange county,—BARRETT, J., presiding.

The government gave evidence tending to show that Olive Ashe of Sutton, a girl of about twenty years of age, and her twin sister, Olivia Ashe, left Sutton about the 28th day of December, 1857, and by railroad went to Levi M. Aldrich's, in Bradford village, he being their cousin, upon the pretence to their mother, a widow, of making a visit; that Olive was at that time in usual flesh and health so far as was known to the family; that the sisters arrived at Aldrich's house and remained about two weeks, in the character of guests and visitors; that they then left his house upon a pretence that they were going to meet some friends at the Fairlee depot, with whom they were going to take an excursion into New York or Massachusetts for a ride; that they went to Fairlee depot, and left the cars and procured a carrier to carry them in his wagon to the respondent, who lived north of that depot about six miles, and about three miles below or south of Bradford village, and kept house and office as a doctor; that on Friday, the 29th of January, 1858, the mother of Olive went to the respondent's in pursuance of a telegraphic dispatch, caused by the respondent to be sent to her that morning, and that about six o'clock in the evening Olive died at the respondent's house, that he procured a coffin for her corpse, and on Saturday the corpse was conveyed to Sutton by railroad, the mother going in the same train; that on the 3d of February, 1858, her corpse was disinterred for the purpose of a post mortem examination, with a view to ascertaining the cause of her death; that such examination was made by Dr. Frost, a physician and surgeon of St. Johnsbury, in presence of Drs. Bliss and Carpen-

ter and other persons ; that the examination extended throughout the body and internal organs, but no examination was made of the brain ; that on such examination the external opening of the vagina was greatly extended, so that the hand, without much difficulty, might have been passed in ; that the uterus was enlarged in size, its walls thickened and its blood vessels increased in size and number as is usual in case of pregnancy, and internally there were marks of the attachment of a *placenta*, that had been removed, leaving the open sinuses, as is usual in case of the removal of the *placenta* upon the birth of a child ; that the breasts were distended and contained milk, and a dark areola about the nipples, as is usual in case of pregnancy ; that the mouth of the womb was then about one and one-half inch in diameter, its natural condition in a woman who has not borne children being about one-eighth of an inch ; that the neck of the womb was greatly inflamed, and thereby the lining membrane had all been taken off; that there were sloughs and holes in the substance of the neck ; that the inflammation was caused by violence by instruments used on that part of the womb ; that the body of the womb. was in a healthy condition ; that all the internal organs of the body were in a natural and healthy condition. Dr. Frost testified that in his opinion the direct cause of death was the inflammation of the neck of the womb and perhaps hemmorhage ; that there was a sufficient cause of the death ; that there had been a *fœtus* in the womb from four to seven months old that had been expelled before the examination ; that he removed the *uterus* at the examination and had preserved it in alcohol.

On the request of the respondent's counsel he produced it and it was exhibited to the jury, and the various parts and marks pointed out and described.

The government then introduced Olivia Ashe, twin sister of the deceased Olive, as a witness, whose testimony tended to show that during the summer and till sometime in the fall Olive had been at work in the family of a Mr. Beckwith, and had thence returned to the family home, and remained till she started for Bradford as above stated ; and for two or three weeks before that time the witness had been at home most of the time and had slept with Olive ; that Olive's health was good enough if it had

State *v.* Howard.

not been for the condition of her mind, and as good-as any one's is in her situation; that the witness and Olive went from home together to Aldrich's in Bradford as above stated.

The government asked the witness what was the purpose of their thus leaving home as understood between them at the time of leaving. This was objected to by the respondent. The government attorney claimed that in its connection with the act of leaving, it was proper as giving character to the act, and as tending to account for and explain other transactions and incidents that would be developed in the progress of the trial, disclaiming any use of it taken by itself as tending to show that the respondent had committed the crime charged. The court permitted the question to be asked, and the witness answered that, "I had some talk of going on a visit before I knew she was going. I and she supposed her to be pregnant, and she left Sutton to get an abortion procured, as was understood between us at the time we left." To the admission of this testimony the respondent excepted.

On further examination the witness gave evidence tending to show that after having been at Aldrich's several days, and on the day before going to the respondent's, the witness and her sister, Olive, met at the Vermont House, in the village of Bradford, Daniel Beckwith, a young man, son of the Mr. Beckwith with whom Olive had lived the previous summer, and there it was first determined to go to the respondent's. On cross examination she testified that when they left home she did not know *where* her sister was going to for the purpose of having the abortion procured; that they had not in mind to go to the respondent's; that they knew there was such a man, but knew nothing about him; that what determined her sister to go to the respondent's for that purpose was the advice of Beckwith when they met him at the Vermont House as above stated. Also that she supposed her sister to be pregnant before her sister told her so, for the reason that she was *bigger*; that said Daniel Beckwith had told her of Olive's condition before she spoke to Olive about it; that the day after Beckwith thus told her she, for the first time, spoke to Olive about it; that she had thought of it before he thus told her; also that when they came to Bradford they expected to meet Daniel Beckwith there, that it had been so appointed, and

that when he came he called at Aldrich's for Olive, and she went to the hotel with him, and in a little while she came for the witness who went with her to the Vermont House, and there saw Beckwith ; also that Beckwith made arrangements for them to go to the respondent's.

The testimony of Olivia, on her examination in chief, further tended to show that she and her sister Olive went from the Fairlee station to the respondent's at the time and in the manner above stated, and on arriving there they made known to the respondent the condition in which Olive then was, that she was pregnant, and in reply to his inquiry, he was told that she was six months advanced ; that they proposed the subject of his procuring an abortion, but he did not give any decided answer at that time, and gave them to understand that he wanted to see Beckwith before giving a decided answer ; that they remained there, and after several days Olive received a letter from Beckwith, a part of which was read to the respondent, and thereupon he concluded to go through with the operation for the sum of one hundred dollars ; that he said it would take some three or four weeks to get her through with it ; that he then prescribed and gave her medicine in the form of bitters, about a goblet full at a dose, two or three times, though the witness was not sure as more than once ; that it operated as an emetic and cathartic, the witness not knowing as she heard him say for what purpose ; that they took a room up stairs in the respondent's house, on their arrival, which they kept till the death of Olive ; that after he had given Olive this medicine, and on Friday of the week next after their arrival at the respondent's, the respondent performed an operation on Olive with instruments, she lying on the bed in their room, the witness and respondent only being present ; that he had three or four instruments present ; that he used two or three as witness thinks, though she was not positive that he used more than one; that he used the instruments internally upon the private parts of Olive ; that Olive complained of pain and its hurting while the operation was going on ; that discharges of water came from her, which continued for two or three hours and more ; that on the next day he made another operation in a similar manner and attended with pain, indicated by complaints and gripping

of the hands; that the result of this operation was flowing; that the witness saw considerable blood; that near night of the same day the respondent performed a third operation, making the same use of instruments as in the former operation, and in connection therewith introduced his hand ; that the result was a child about two-thirds as large as full grown ; that witness saw it in the respondent's hands, and it was carried out of the room by him, and not by her seen afterwards ; witness was not asked by either party, nor did she testify whether she saw signs of life in the child ; that this operation was attended with indications of pain ; that the flowing at that time was not large, but flowing continued for a few days ; that at these operations only the witness and respondent were present ; that the witness had the care of Olive and was with her most of the time; that after the second operation she did not sit up much, but did occasionally to have the bed made, and to rest her, till within two or three days of her death ; that the witness did not think her rational long after the last operation ; that she talked wildly and acted violently; that she died Friday about six o'clock in the evening, January 29th.

The government produced and gave in evidence a copy of the record of the justice before whom the respondent was brought upon the charge of the crime for which this indictment was found, and by whom he was bound up to the county court to answer thereto, showing that the said Olivia thereupon appeared as a witness and was recognized to appear as a witness upon said charge before the county court.

Olivia then testified that she was at said court of inquiry, and was called on to testify ; that there was no examination, the respondent waiving an examination ; that after that trial she returned to Sutton, and afterwards went to Montreal.

The government here offered to give evidence by Olivia, tending to show that a few weeks before the June Term, 1858, of the Orange county court, the respondent participated in procuring her to go out of the State and to Montreal, agreeing to find her all the money she wanted while she was gone, for the purpose of preventing her from being used as a witness against him in the prosecution of the crime for which he was bound up as aforesaid,

26

and for which this indictment was found, and that she went to Montreal accordingly and remained a few weeks, when, receiving all the money she needed, she returned to Sutton two or three days before June Term, 1858, of said court, through the intervention of her friends.

This evidence was objected to by the respondent. The objection was overruled and the evidence accordingly was given, to which the respondent excepted.

Dr. Selim Newell of St. Johnsbury, a physician and surgeon, was introduced by the government, whose testimony tended to show that he examined the uterus of Olive Ashe the morning after it was removed by Dr. Frost, as above stated; that its appearance indicated a state of pregnancy, and that a *fœtus* had been expelled; that in his opinion the marks within the neck of the uterus were caused by mechanical injury; that he knew of no other causes that would produce such appearance; that such a wound as was indicated would have produced hemorrhage; that he did not know to what extent, but that it might be to the extent to produce death; that in his opinion the *placenta* was in this case removed but a few hours before death; that the woman could not have lived more than five hours after the removal of the *placenta*, and that bleeding would continue up to the time of the change called *dying*.

On cross examination, in answer to questions put to Olivia Ashe, she testified that she knew a girl at the respondent's by the name of Margaret Kelley; that she did not remember of going to her in the evening of the day of their arrival at the respondent's to get a pail for soaking some clothes, and saying that her sister had been traveling, and it had made her worse, nor of having any pail for such a purpose, nor of handing a pail back the next morning with bloody water in it; that she did not think she did. The respondent introduced Margaret Kelley as a witness, who testified that Olivia Ashe was in the back part of the house the evening after her arrival, where she, Margaret, was at work, and wanted a pail to soak some clothes in, saying that her sister was unwell, and it made her worse coming in the cars; that she gave her a pail; that the next morning she found it in the back room with some bloody water in it.

State *v.* Howard.

The respondent gave evidence by other witnesses tending to show that they were from time to time in the room and about the bed of Olive for some days before her death, and that they did not see any bloody clothes about her on her bed.

The respondent gave evidence tending to show that Olive rode from Fairlee depot to the respondent's in about an hour; that on her arrival at the respondent's she looked very pale; that her lips were sore; that she looked dark under her eyes; that she arrived there a little before or about noon; and that in the course of that afternoon she was seen lying on the sofa in the parlor.

The respondent offered to show by a witness (Miss V. Bartlett) what Olive said to her that afternoon as to her health, and also as to what she said caused the sores on her lips, viz: that she said she was very sick, and very much fatigued by the journey. To this the State's attorney objected, and it was excluded by the court, to which the respondent excepted.

The respondent offered to show by Susan Squires, a witness introduced by him, who went to the respondent's on the 23d of January, 1858, and remained there till after the decease of the said Olive, and up to the 26th of last June, as *dying declarations* of Olive Ashe, what she told the witness about noon of Thursday, the day before her death, and the court permitted the testimony to be given as addressed to the court, in order to determine whether it was admissible as *dying declarations*. The witness then testified as follows: that on Thursday, she had conversation with Olive about noon, while her sister was at dinner; that Olive told the witness she thought she could not live and did not expect to, that she had been taking powerful poison medicines before she came to Dr. Howard's, and she thought she had destroyed her life, and that that was what caused her mouth to be sore, that she hoped they would not blame the doctor, and that she thought he had done everything he could to restore her health, that she had been out of health a long while; that nothing else was said with reference to the subject; that the witness did not see any indications that she was not perfectly sane, and that witness had never discovered any insanity about her, and had no suspicion of it; that she seemed sane through that day, but that on the next morning she seemed to have lost her reason.

On cross examination the witness testified that she had been at the respondent's some for over two years before the 23d of January, 1858, sewing and to receive medicines : that she remained from that time till the 26th of June, 1858 ; that she thought she did not relate to the respondent before leaving what she had testified Olive said to her in apprehension of death ; also that on that Thursday, Olive seemed to be sinking, and about four o'clock that morning kicked off the foot board of her bedstead ; that her sister called her and Mrs. Green into the room, and that Olive then complained of being tired, and didn't talk much ; that witness could not say whether Olive was insane ; that the kicking continued but a short time, then she quieted down herself ; that Olive began the conversation Thursday noon ; that as near as the witness could recollect she said she thought she could not live, felt afraid she could not live, felt as though she had destroyed herself ; she didn't say she thought she should die speedily, but that she felt as though she could not recover.

The government introduced Mrs. Greene, as a witness, whose testimony tended to show that she went to the respondent's on Tuesday forenoon, and staid a week on a visit to Mrs. Howard, and that Olive died the next Friday evening ; that she first saw Olive on Wednesday forenoon, at the request of her sister, on account of Olive's having the nose bleed ; that Olive was lying in bed, her hands trembling, and she couldn't help herself ; that she did not seem to take notice of the persons about her, or what they were doing ; that the witness saw her again about four o'clock Thursday morning ; that she was then crazy and kicking ; that she kicked out the foot board and three slats underneath ; that they held her on the bed as well as they could, and quieted her ; that the witness remained with her till daylight ; and that from the time the witness went to the respondent's till Olive's death she did not find her in a condition to be able to converse.

On cross examination she testified that she was in and out of Olive's room through the day of Thursday after leaving her at daylight ; that she was crazy all the time ; that witness asked her questions ; she would not answer the questions that were asked her, but would make broken sentences.

The testimony of Olivia Ashe also tended to show that Olive

was insane for three or four days before her death. From the evidence bearing upon the subject, the court failed to find that the declarations testified to by Susan Squires, if made as testified to, were made under the apprehension of death. but on the contrary the court were fully satisfied that Olive was in such a condition of mind at the time of the alleged conversation with the witness as to be incapable of any rational apprehension or understanding on any subject. The court, therefore, directed that the testimony of Susan Squires, as to her conversation with Olive, could not be received as showing the *dying* declarations of the latter. To which decision the respondent excepted.

The respondent, on the cross examination of Olivia, asked her as to what she had said to various persons as to the condition, conduct and cause of the death of Olive, and then introduced those persons as witnesses whose testimony tended to show that she had said various things to them inconsistent with the facts to which she testified in this trial, with a view to discrediting her as a witness.

The respondent introduced medical evidence which tended to show that the signs and indications of pregnancy, and of the delivery of Olive of a child, which the testimony in behalf of the prosecution developed, might be accounted for otherwise than by the fact of pregnancy and delivery of a child, and that the appearances about the neck of the womb, described by Drs. Frost and Newell, and indicating in their opinion mechanical violence used there, as above stated, might be otherwise accounted for, and might have been the result of diseases, which, with the appearances that might result therefrom, were fully described by the medical witnesses introduced by the respondent; and also that upon the symptoms and appearances developed by Olive, as testified by the witnesses on both sides, if she was in fact pregnant, the child might have been dead in the womb at the time of the first operation by the respondent, as testified to by Olivia Ashe; and also that the death of Olive was not, upon the evidence given, which was proper for a professional witness to consider in forming a professional opinion, satisfactorily made out to have resulted from the procuring of the abortion, as the evidence for the prosecution tended to show.

Dr. Phelps, one of the medical witnesses, introduced by the respondent, in the course of his examination among other things testified : " From what I've heard testified by Olivia as to what occurred at Dr. Howard's as to operations, pain, symptoms and appearances, I heard no evidence tending to convince me that a living child had been born, excluding her testimony that she saw one. I am not satisfied that a *living* child was born, if a child was born. I saw nothing in her evidence that *convinced* me that there was a living child *in utero* at any time. If a *child* was *in utero* I see no evidence that it was living at the time Dr. H. performed his first operation."

Dr. Allen, a medical witness introduced by the respondent, in the course of his examination testified among other things : "From what I've heard of the testimony of value to a medical man, (as the basis of a professional opinion) I see no positive evidence of the vitality of the *fœtus* at the time it was taken away. It is my opinion it was not then alive. On the same *data* I see no positive evidence of life of the *fœtus* when Dr. H. performed the first operation."

The evidence in the case tended to show that the respondent, at the time of the alleged offence, had resided in and occupied a house in Bradford for about three years ; that prior thereto it had been owned and occupied by Mr. Waterman then deceased, whose widow the respondent married about two years before the alleged offence ; that upon this marriage the respondent controlled and occupied the house and the farm appurtenant till sometime in the summer of 1858, residing and keeping his family there ; that during all the time of his residing there, both before and after his marriage to Mrs. Waterman, many patients were accustomed to resort to him there, both male and female, some of them staying for longer or shorter periods to be professionally treated by him ; and also that he erected an office near to and in connection with the house which he used for professional purposes, to which office was attached a privy, for the use of the office, and not for the use of the family household.

After the defence had rested, the prosecution gave additional evidence for the purpose of rebutting some points of the evidence introduced by the respondent, and of strengthening the case made

in the opening, and to that end introduced as a witness Agnes Wilson, the mother of the respondent's wife, who testified that at the time of the trial she lived at the house formerly the residence of Dr. Howard and her daughter in Bradford, and had lived there since the 8th or 9th of February, 1858.

At this point a quantity of bloody clothes were exhibited, amongst which were two female *chemises,* a small quilt or pad some two feet wide and three or four feet long, appearing to have been very much besmeared with blood.

The witness then testified that in October or November, 1858, when cleaning house, she found these articles between the rafters in the L part of the house, in the coving, and concealed by a board that was shut in between the rafters; that when she took them out, a black stuff like dry clots of blood sifted off from them; that she had had charge of them ever since; that no member of the family had known about them after she found them; that one of the *chemises* which was exhibited had the appearance of having been removed from the person by cutting.

The government offered to prove by the same witness that within the first fortnight after the respondent's confinement in jail, he having been committed the latter part of May, 1858, as she was passing from the office to the house, she saw one of the respondent's dogs come out from under the office privy, with the form of a child in its mouth; that he dropped it on being ordered by her, and the witness examined it and found it to be a child, in the judgment of the witness, four or five months grown; that it was putrid and decayed; that she had noticed the dogs digging about the privy vault for some time previous till they had worked a hole in the dirt under the plank, out of which hole the dog came with the child in its mouth; that while she was looking at it a large dog belonging to the respondent came up and snatched it away and ran off with it.

To this evidence the respondent objected, but the court admitted it to be given, and the witness testified substantially as above stated, to which the respondent excepted. The witness, in describing the child, pointed out its length and size on her arm, indicating it to be in these respects similar to the child which Olivia Ashe testified she saw taken from her sister.

State *v.* Howard.

In the course of the examination of Olivia Ashe, she testified that while she was at the respondent's she was in his office on the day of her arrival and saw some infants there, one-half dozen perhaps of all sizes, preserved in spirits. No evidence was given by either side to show what had become of them.

The respondent among other things requested the court to charge the jury as follows:

I. That to support the first, second and third counts the government must prove the following facts:

1. That Olive Ashe was pregnant with a *living foetus* at the time the respondent first operated on her. This must be proved beyond all doubt. There must be no speculation on this point. If there is doubt on this point this ends the case.

2. That the respondent, with intent to procure a miscarriage, used some instrument other than his hand to produce the same.

3. That the inserting the speculum for the purpose of an examination of the parts, even if it resulted in an abortion, if there was no intent to procure an abortion, would not be sufficient to sustain the indictment. The jury must find that the respondent used an instrument with intent to procure an abortion. This must also be proved beyond all reasonable doubt.

4. That it must be proved that the respondent had no justifiable cause for the operation. That in order to convict on the first count, the jury must find that Olive Ashe was pregnant with a living *foetus* at the time the respondent performed the first operation.

5. That if the foetus was then dead there can be no conviction on this count, even if Olive Ashe died from the effect of the operation from the unskillfulness of the respondent.

6. That it is no offence under the statute to attempt to procure the miscarriage of a woman pregnant with a dead foetus.

7. The respondent being a physician, the law implies his innocence as in other cases, and also that he acted in good faith in his profession and in a justifiable manner until the government prove the contrary. And the burthen of proof is on the government to prove this fact beyond all reasonable doubt.

8. That the presumption of innocence overcomes the presumption of the continued life of the foetus at the time of the opera-

State v. Howard.

tion (if any was performed,) and therefore the government must prove the continued life of the fœtus at the time by other sources of proof than showing the impregnation of the deceased.

9. That if they find that the respondent had reasonable ground for belief that the fœtus was dead, and he acted on that ground of belief, then he cannot be convicted on this count, even if death ensued from his want of skill in performing the operation.

II. That the jury could not convict on either count unless they find a state of facts proved that supported the count and excluded every other reasonable conclusion but that of the guilt of the respondent.

III. That the bloody clothes must be laid out of the case by the jury, as there was no proof put in tending to show that they were ever in the respondent's hands, or that he ever had any knowledge of the same, or that they were ever in the possession or on the person of Olive Ashe, and the government have not attempted to identify the same.

IV. That the testimony of Mrs. Wilson, as to the fœtus, must be laid out of the case, as there was no proof tending to show that the fœtus she saw was the fœtus taken from Olive Ashe, or that the respondent put the same in the privy, or had any agency or knowledge of its being there.

V. That if the jury should find that the respondent was aiding in procuring Olivia Ashe to go to Montreal to prevent her being a witness, that was no proof to show that he committed the acts alleged in this indictment.

That if the jury could find a state of facts consistent with the innocence of the respondent and accounting for the acts proved in this respect, if any were found, then such acts were entitled to no weight. That in order to give any weight to this evidence, they must find, beyond all reasonable doubt, the fact that he did aid in getting her away.

VI. That it was not sufficient to warrant a conviction to prove the fact of an attempt to procure an abortion, or of an abortion having been procured, but that the government must prove affirmatively, beyond all reasonable doubt, facts that prove the want of a justifiable cause in this particular case on trial.

VII. That there was no testimony tending to prove that instru-

ments were used by the respondent, except the testimony of Olivia Ashe. That as she was an accomplice, the jury could find no fact on her testimony alone ; and that as this point was not proved beyond a reasonable doubt, there could be no conviction.

The court refused so to charge in all respects, but among other things, not excepted to, charged as follows :

As to the three first counts the court charged the jury as requested, except in respect to its being necessary for the government to prove the *foetus* to have been alive when the first operation was performed as testified to by Olivia. In this respect the court charged the jury that it was necessary for the government to prove beyond a reasonable doubt that Olive Ashe was pregnant with a child at the time the respondent performed the first operation, and that he undertook it with the intent to procure a miscarriage, without lawful justification ; that if he undertook it for the purpose of enabling her to avoid the disgrace of giving birth to a bastard, and not as a matter of medical treatment, having reference to her life or health, it was without lawful justification ; but if he did it as a matter of medical treatment with reference to her life or health, it was with lawful justification, and that he could in no event be found guilty of an offence under the sixth count, unless they should find that the death was the consequence of what he did ; that if he used instruments, aided by his hands, in the manner which the government evidence tended to show, with the intent to procure the miscarriage, and without the lawful justification as above explained, and thereby caused her death, the offence must be complete, whether the *foetus* with which she was pregnant was dead or alive at the time of his so operating ; on the other hand, if what he thus did was with lawful justification, as above explained, he could not be convicted whether the *foetus* was dead or alive at the time of his operating.

As to the request marked III. the court charged the jury that if they believed Mrs. Wilson, in the account she gave of the place and condition in which she found the clothes and garments, their being there and in that condition, was a circumstance consistent with the evidence given by the prosecution, as to the manner and attending effects of the attempt by the respondent to procure the alleged miscarriage, and was consistent with the fact

State *v.* Howard.

of a criminal intent on his part in procuring the abortion ; that whether this evidence as a circumstance should have weight, as tending to show the commission of the alleged crime, would depend on the ability of the jury to account for the clothes being there and in that condition, consistently with the innocence of the respondent, taken in connection with the other evidence in the case ; that the fact that the respondent had been previously, as the evidence tended to show, in the occupancy and control of the house, as its occupant and master, and as the evidence tended to show, that he had performed an operation upon Olive Ashe, that would be likely to produce such a condition and appearance of that kind of clothing and articles, and that he performed such operation for the purpose of procuring a miscarriage without lawful justification, this circumstance could not be withdrawn from their consideration, and more particularly in one view presented and claimed by the counsel for the government in the argument, viz : as tending to account for the fact testified by Margaret Kelley, that she did not wash any bloody clothes while the said Olive and Olivia were there at the respondent's, which testimony had been introduced and argued upon the jury, as tending to discredit the evidence of Olivia in regard to the flowing of blood from her sister during and after the second operation of the respondent ; that if from the evidence as to the occupancy of the house prior to the respondent's residing there, and as to the character of his house, as a place of resort for female patients, and the opportunity or motives of others to put and conceal such clothing and articles where those were found, in connection with the fact that there was no direct evidence identifying the two articles of clothing, as belonging to Olive, they could reasonably account for the clothing and articles being there, in the condition in which they were found, and appeared when exhibited, consistently with the other facts and circumstances which they found proved in the case, and consistently with the innocence of the respondent of the crime charged, then the jury should lay this circumstance out of the case, and give it no consideration for any purpose ; if otherwise, they must consider it in connection with the other evidence in the case, and give it such weight, as a circumstance, as they should judge it entitled to.

As to the subject of the request marked IV. the court in the charge put this piece of evidence to the consideration of the jury upon the principles and views similar to those presented in respect to the request marked III, varying remarks and illustrations in respect to the incidents in which the one differs from the other; and amongst other things, as above stated, the court instructed the jury that as the other evidence tended to show that a *fœtus* of similar size had been taken from Olive by the respondent by forcible means, and the respondent controverted the fact on the ground of discredit thrown upon the only witness who gave direct evidence to this fact, and inasmuch as what was testified by Mrs. Willson in this respect was consistent with the other evidence given by the government tending to sustain the charge in the first three counts in the indictment, and so far as the size and appearance of the child was concerned, was consistent particularly with the testimony of Olivia, and as the respondent had been the owner and in the occupancy and control of the office, house and their appendages from the time of the alleged offence to near the time when the child was seen by the witness, as testified by her, this evidence could not be withdrawn from their consideration; that if they gave full credit to Mrs. Wilson in this respect they would regard the fact as a circumstance in connection with all the other evidence in the case, and if they could reasonably account for the circumstance consistently with the innocence of the respondent, they would lay it out of their consideration for any purpose, otherwise they would consider it in connection with the other direct and circumstantial evidence, and give it such weight as they thought it entitled to.

As to the request marked V. the court charged the jury that the evidence was proper for their consideration as tending to show conduct of the respondent inconsistent with his innocence of the charge, to sustain which Olivia was recognized to appear as a witness before the county court. If they found it proved that the respondent did aid in procuring her to depart from the State for the purpose of preventing her from being used as a witness against him, in the further prosecution of the respondent for the offence charged, they would treat it as a circumstance in connection with the other evidence; that if they could find a

State *v.* Howard.

state of facts consistent with the innocence of the respondent, and accounting for his acts in this respect, consistently with his innocence, then this circumstance would be entitled to no weight as tending to show his guilt.

As to request marked VI. the court charged the jury as requested.

As to the request marked VII. the court charged the jury fully in relation to the law as to the consideration to be given to the testimony of an accomplice, as applicable to Olivia Ashe, in her relation to the subject matter of this prosecution, agreeably to oral requests made to the court by the counsel for the respondent in the course of his argument to the jury, and in conformity with the grounds and views upon which the counsel for the respondent presented her testimony in arguing the same to the jury. The court also instructed the jury that they must be satisfied from the evidence in the case, beyond a reasonable doubt, that the respondent was guilty of the offence charged in the first three counts in the indictment, committed in the manner there charged, or they could not find him guilty on either of such counts ; that the only direct evidence of instruments having been used was the testimony of Olivia Ashe, or of an abortion having been attempted or procured by the respondent ; that as to the manner in which it was done or attempted, they would consider the evidence given by the medical witnesses for the prosecution tending to show that mechanical violence had been inflicted on the neck of the womb, in connection with the testimony of Olivia, and determine whether she was corroborated thereby in this respect, and if so, whether the evidence bearing on the subject, taken together, satisfied them beyond a reasonable doubt of the truth of the charge as set forth in said counts of the indictment.

The respondent's counsel claimed that the testimony of Margaret Kelley, as to Olivia applying to her for a pail, and what Olivia said to her on that occasion, and the finding of the pail in the morning with the bloody water in it, was evidence not only tending to effect the credit of Olivia, but also was competent evidence tending to show that Olive was then having hemmorhage from the womb.

The court instructed the jury that it was proper to be considered for the former purpose only.

The court charged the jury fully, and in a manner to which no exception was taken as to the rule of evidence in order to warrant a conviction, as to presumptions of innocence and how they must be overcome by the legitimate force of the evidence of guilt; and amongst other things upon the subject, the court told the jury that by the law the respondent was presumed to be innocent of the crime charged till he was proved, beyond a reasonable doubt, to be guilty; that this presumption extended to every act which the evidence tended to prove had been done by him; that every such act was presumed to have been done innocently and with lawful justification, and such presumption continued and was effectual in favor of the respondent until overcome by affirmative proof, which produced a conviction beyond a reasonable doubt that such acts were criminal.

As to direct and circumstantial evidence, and therein how facts must be proved in order to entitle them to be treated as circumstantial evidence, and the mode in which such evidence is to be treated, weighed and disposed of, amongst other things on this subject, the court told the jury that every fact which was to be regarded as *a circumstance*, and weighed by them as *circumstantial evidence* must be proved beyond a reasonable doubt, before it could be considered by them as evidence; and also that when any circumstance had been thus proved, if they could reasonably account for its existence consistently with the innocence of the respondent, they would lay it out of consideration as tending to show his guilt; that they would take into consideration, and give weight to only such circumstances thus proved as they could not reasonably account for consistently with the respondent's innocence.

The court instructed the jury that if they found the offence charged under the first three counts proved in all respects, and should fail to find that the death of Olive Ashe was the consequence thereof, they would return their verdict for the minor offence, a misdemeanor under the statute. The jury returned a verdict of guilty of the minor offence, under the first three counts,

and not guilty under the fourth, fifth and sixth counts of the indictment.

To the refusal of the court to charge as requested, and to the charge as above detailed, in those respects in which it differed from such requests, the respondent excepted.

*P. T. Washburn* and *J. A. Wing*, for the respondent.

*Charles O. Dewey*, State's Attorney, for the prosecution.

REDFIELD, Ch. J.    The important question in the case is, whether the death of the *fœtus* before the attempt of the respondent to procure the abortion, is material as to his guilt.    It is undoubtedly one of considerable practical importance.    If we regarded the statute as chiefly intended for the protection of the life of the *fœtus* it would incline us very strongly to the view taken of the case by the respondent's counsel.    But it is obvious that there are many other important considerations connected with the offence besides the preservation of the life of the child.    The life and health of the mother, and the probability of future offspring are all so seriously put at hazard by such a transaction, when produced by mechanical means, that it is not easy to determine precisely which is the more important purpose of the statute, to prevent the injury to the child or to the mother.    Then the evil example of such a practice, and the teaching the mothers, or thus attempting to teach them, the facility with which they may escape the perils of child bearing, and the consequent responsibilities, and the impediments to a life of ease and vicious indulgence, are among the most pernicious consequences of such abominable practices, and are no doubt properly to be regarded as fairly coming within the evils to be considered in fixing the construction of the statute and its probable object and purpose.    We cannot, therefore, regard the continued life of the *fœtus* as essential to the perpetration of the offence, with reference to its general character.

But undoubtedly the terms of the statute, where they define the offence, are to have a controlling effect in the matter.    It would certainly not be allowable, in a case of this highly penal character, to give the statute an operation, with reference to its

State *v.* Howard.

general purpose, beyond the clear import of its terms. And if the statute does in terms require the continued life of the *fœtus* at the time of committing the offence, however unimportant it may seem to us, it must be proved in order to insure a legal conviction.

The statute does specifically require that the woman should be with child at the time of committing the offence. We could not then adopt the view which was attempted with reference to Lord ELLENBOROUGH'S Act, 43 GEO. III, chap. 58, that it was not important whether the woman were with child or not; LAWRENCE, J., in *Rex* v. *Phillips*, 3 Camp. 76. But this view seems not to have finally prevailed in regard to the English statute. For in *Rex* v. *Scudder*, 3 C. & P. 605, it was held that the woman must be with child in order to insure a conviction under the 43 GEO. III, C. 58. But under the present English statute, 1 VIC. C. 85, sec. 8, and 14 and 15 VIC. C. 100, sec 9, that fact does not seem to be held essential to the conviction. *Rex* v. *Goodchild*, 2 Car. & Kir. 293; S, C., affirmed by the fifteen judges, *id.* But under our statute it is expressly required, to constitute the offence, that the attempt be to procure the miscarriage of a woman " then pregnant with child." This last clause is omitted in the present English statute, which is the only difference between that statute and our own. This is the only fact required to be shown under our statute beyond what is required under the English statute, and we infer that this portion of the statute of this State has been introduced purposely, *de industria.*

The "miscarriage" is required under the English statute. And if the term "miscarriage" may properly be predicated of a woman not with child, as the English courts held, it may surely be *a multo fortiori* of one where the *fœtus* is not in life, or has died, or been killed. So that the only new question arising under our statute is, whether it is essential to the pregnancy, or being " pregnant with child," that the child should be still alive. It is not claimed that it is necessary the embryo should have quickened. The general form of expression " pregnant with child," seems to have been used to escape all question of this kind and have it clearly apply to every stage of pregnancy, from the earliest conception; and if so, we see no reason why it should not extend

through its entire term, until the actual expulsion of the *fœtus* For it will not be claimed that, strictly speaking, the pregnancy ceases until this event. We think, therefore, that there is no good ground to claim that the mother, after conception, ceases to be pregnant with the child until its actual expulsion from the uterus.

There are, unquestionably, many cases of pregnancy where it becomes matter of certainty that the *fœtus* cannot come to maturity, or to birth, without the destruction of either the mother or the child, and sometimes of both. But we do not apprehend that one who should attempt unlawfully to procure an abortion in such a case, for instance, without being aware of these embarrassments in the case, is to be acquitted of the attempt to commit a crime, because thereafter it might have become necessary for the surgeon, in the course of legitimate practice, to destroy the *fœtus.*

It would seem probable that this general form of expression, "pregnant with child," was used in order to escape all such refinement about the probable injury, either to mother or child. The statute evidently intends to discriminate between the lawful operation of the medical man, in the due course of his legitimate practice in such cases, when it becomes imminently perilous to delay longer to interfere with the due processes of natural growth, and that voluntary interference in such matters which is prompted by no such motive, but originates in a reckless disregard and defiance of the laws of nature, in order to procure an abnormal exemption from those natural results flowing from illicit or unbecoming indulgence, which the law therefore reprobates.

We think, therefore, that it cannot, with plausibility even, be maintained that the continued life of the *fœtus* is indispensable to the commission of the offence. Most of the vicious purpose and motive for its perpetration, in the majority of cases, still remains; all indeed, or nearly all, to which we have before alluded, if we except the chance of the birth and maturity of a responsible and useful human being, which must indeed be recognized as a very important consideration, although attended with many contingencies and uncertainties, and by no means; in itself, so important as many other consequences directly and incidentally connected with such unlawful and degrading practices.

27

There is, indeed, a certain degree of plausibility in the argument attempted to be deduced from the literal import of the term "miscarriage." The compound nature of the word seems to imply a departure from the natural course of gestation, and the consequent destruction of the *fœtus*. But the word has not received any such construction in the English courts. It is not so understood, either legally, or medically, or popularly. We cannot, therefore, suppose it was intended by the framers of this statute to be so received. Medically, this term is strictly applied to the expulsion of the embryo during the first six weeks after conception. Legally and popularly, I apprehend, this term applies to the expulsion of the *fœtus* at any time during the period of gestation. And although, in the majority of instances, it occurs in consequence of the destruction of the life of the *fœtus*, where otherwise it would have been born alive, this is not of the essence of the act any more than the life of the child is necessary to a birth. And it cannot be questioned that a child, brought into the world in the course of nature without life, but at the end of the full period of gestation, may properly enough be said to be born, or still born, or born dead, and that this form of expression is strictly accurate, both in legal and popular language.

We cannot, therefore, regard the term "miscarriage" as necessarily implying the continued life of the *fœtus*. And we do not understand that it is claimed the respondent did not have the full benefit of any presumption or proof in the case, that he might have acted professionally. This view, although put to the jury in form, does not seem, from the general course of the evidence as detailed, to have been a view which was or could have been much insisted upon. It seems highly improbable from the general course of the trial, that if the *fœtus* was in fact dead, it could have been so understood at the time, either by the mother or the respondent. We can scarcely suppose the respondent so utterly ignorant upon the subject as not to have understood that if such was the fact the expulsion must inevitably occur very shortly, in the due course of nature.

The case, upon the most favorable view for the respondent, was one where the respondent believed it to be necessary to use mechanical means to procure a miscarriage, and therefore did use

them with that view, and in a way calculated to destroy the *foetus* and thereby did attempt to procure a miscarriage at an earlier period than it would otherwise have occurred, the *foetus* being at the time dead, without his knowledge or suspicion. And upon this latter fact being subsequently discovered, the respondent asks for an acquittal upon the ground that he seriously contemplated the commission of the offence, and attempted it, but that it was in fact impossible at the time, the woman not being with child, because the child was dead. We cannot adopt this view of the case. We think the mother is with child, whether the child be dead or alive, until the actual miscarriage by the expulsion of the *foetus*. We are aware that some of the text writers upon medical jurisprudence speak of the "procuring a miscarriage" as the premature destruction of the *foetus*. This being the mode by which a miscarriage is produced, it may, by a figure of speech, be put for the thing itself in a loose mode of speech. But in careful language we always discriminate between the cause and the consequence. The miscarriage itself is nothing more than the premature expulsion of the *foetus*, and so the text writers generally speak of it, unless under a figure. The death of the *foetus* is no more the actual miscarriage than the maturity of the child is the actual birth. Either consequence must follow, and is therefore not identical with its corresponding antecedent.

In regard to the exceptions taken at the course of the trial, we shall but briefly allude to the grounds upon which we think they should now be overruled. The most important consideration to be borne in mind in revising so extended and complicated a trial, it that it should not be set aside unless upon grounds reasonably satisfactory, since, in a court of error, all fair presumptions are to be made in favor of the judgment below.

I. The extent to which the testimony of Olivia Ashe was required to be corroborated, is all that could reasonably be demanded. The corroboration must be upon points where the testimony was material to the conviction, and to such an extent, as upon the whole case to leave it satisfactory to the minds of the jury, to the same extent as would be affected by the testimony of a credible witness. We think the charge must have been so understood, and that the proof detailed did tend to show such corrobora-

tion. We do not think the court is required to be more specific; 1 Greenleaf's Ev. sec. 381.

II. The declarations of Olive Ashe, as to the purpose of the journey in going to the respondent's, were properly admitted as part of the *res gesta*. The mere act of going was equivocal; it might have been for professional advice and assistance. The declarations were of the same force as the act of going, and were admissible as part of the act.

III. The declarations of Olive Ashe, offered as dying declarations, were properly rejected, and as they were only admissible in regard to the count for manslaughter, where there was an acquittal, the question has now become immaterial, except in the event of a new trial; *Rex* v. *Mead*, 2 B. & C. 605; 1 Greenl. Ev. sec. 156. So, too, the judge having decided they were not so made as to be admissible as evidence, his decision is conclusive; 1 Greenl. Ev. sec. 160; *King* v. *Woodstock*, 2' Leach Cr. Cases, 563.

IV. The testimony of Margaret Kelly seems too equivocal to be received as evidence, and if it had any possible tendency to show the fact claimed, it certainly was merely conjectural, and not of that obvious character which is required to make circumstantial evidence, and especially that which depends upon transactions of this remote and uncertain character, admissible. The admission of all the facts claimed as inferences from her testimony, may be explained upon grounds entirely consistent with the theory of the prosecution. The blood found in the pail, if it were admitted to have come from the person of the deceased, is no certain indication of an incipient micarriage.

V. The declarations of Olive Ashe, soon after her arrival at the respondent's, as to her feelings and the state of her health, were admissible to prove these facts, if they became material in the case. The present state of health or feeling is always allowed to be proved in this way, since it is the only mode in which it can be shown; Greenl. Ev. sec. 102 ; *Aveson* v. *Lord Kinnaird*, 6 East 188 ; *Gray* v. *Young*, 4 McCord 38 ; *Gilchrist* v. *Bale*, 8 Watts 355.

But it is not very apparent how the state of Olive Ashe's health or feelings, at the time she came to the respondent's, became

important in the course the trial took. If the life of the *fœtus* at that time were a question involved, the state of health of the mother would have some bearing on the question. But that question being here ruled unimportant, it seems to deprive the testimony offered in regard to the declarations of Olive Ashe, of all significance. For it would seem from the requests to charge, and what is said in the charge, that the respondent's counsel did not make the distinct question before the jury, whether the respondent acted professionally in good faith in what he did. And if this question had been made, the only declarations offered which could have had any possible bearing upon it, are that she was " very sick and very much fatigued." The fatigue is sufficiently accounted for by the journey she had just taken, and is not, therefore, any evidence that she was, or claimed to be, in any unnatural state. And the expression, " was very sick," does not point to any such definite state of health requiring the species of professional assistance implied in this feature of the defence, as fairly to justify the court in according a new trial upon the ground of the rejection of this evidence. The uncertainty whether the testimony might not have some bearing in the case, would probably have induced me, had I been trying the case, to admit it, as the safer course. But being rejected, we must now be able to see that the respondent has suffered in his defence on that account, or we cannot reverse the judgment. This we do not regard as sufficiently obvious to warrant a new trial. We believe, from all we can learn in regard to the course of the defence, that this portion of the evidence was only relied upon in regard to the life of the *fœtus*, and if admitted could have had no sensible bearing upon any other question.

VI. The *fœtus* found secreted about the buildings was certainly a most unusual and most significant fact, and one tending very strongly to show the *corpus delicti*. The discovery could only be accounted for upon the theory that some one had committed an offence of the character charged in the indictment, in the immediate neighborhood. And the history of criminal jurisprudence shows very clearly that human bones, and other remains of the human body, found secreted about the buildings occupied by the prisoner about the time of an alleged murder, are always

State *v.* Howard.

received to prove the *corpus delicti*, and also as tending, in some degree, to identify the guilty party. This testimony undoubtedly did tend very considerably to corroborate Olivia in her account of the transaction. And it is only by supposing that some other person did commit a similar offence about the same time and place, or else that the respondent had committed other similar offences then and there, that we can give any satisfactory explanation of these discoveries, without regarding them as most convincing proof, not only of the *corpus delicti*, but of the guilt of the respondent.

We think, too, that the general rule which the county court laid down to the jury, in regard to the proper weight of circumstantial evidence, was unexceptionable, and that the detail of the charge upon this particular point was sufficiently guarded, and although it is still possible the jury may have misapprehended the charge, and thus have given this portion of the evidence a more controlling effect than was intended, or was proper, we do not feel so assured of this as to justify a new trial. And finally, although I have felt some hesitation in regard to these two last points, they are so unimportant in themselves, in comparison with the other parts of the case, and the general course of the trial was so well guarded, and there being no reliable ground of belief that any departure from the strictest rules of law did occur, I feel content to overrule the exceptions upon all the points. But in doing so, to prevent misconstruction, we may be justified in saying that a more liberal and charitable view in the admission of evidence, and the construction of the respondent's conduct, when it can be rationally maintained, is generally to be desired in criminal trials. But some cases will occur where such a view is difficult to be supported, and where it is obvious that all efforts at exculpation are but a struggle against the most embarrassing probabilities. In a case of this latter character, a court of error should not award a new trial when it is obvious from the detail of the evidence that it could be of no avail towards an acquittal, and that the trial had been fair, and patient, and satisfactory, and no obvious errors in law had occurred.

Exceptions overruled, and respondent sentenced to the State prison.