Wilkin, J.
Section 12412, General Code, reads as follows: “Whoever, with intent to procure the miscarriage of a woman, prescribes or administers to her a medicine, drug or substance, or with like intent, uses an instrument or other means, unless such miscarriage is necessary to preserve her life, or is advised by two physicians to be necessary for that purpose, if the woman either miscarries or dies in consequence thereof, shall be imprisoned,” etc.
It will be observed that the statute does not now require, as formerly and at common law, that the drug shall have been administered to a woman (1) “pregnant with a quick child,” nor (2) “with intent thereby to destroy such child.” This statute regards not only the life of the child, but also the life of the woman, though she be not with child in fact.
Here were two physicians, but neither their testimony nor other evidence establishes that the removal of the fetus was deemed or advised by them to be necessary to preserve the woman’s life. We have, therefore, two questions: 1. Whether the intent to remove a dead fetus is an intent to procure abortion or miscarriage, when the removal is not proven to be, nor advised by two physicians to be, necessary to preserve the mother’s life; 2. is the administering of chloroform (which-is not an abortive drug) with the intent to produce anes *40 thesia, as a preliminary step to carrying out the intent of removing the fetus, if it be found to be dead, administering a drug with intent to procure miscarriage ?
1. We remark, first, that the evolution of this statute of Ohio seems to show that it was enacted in its present form to cover any case of procuring the premature removal or expulsion of the fetus, living or dead, with other intent than to preserve the mother’s life.
Second, the object of the statute is to prevent any operation, or use of drugs, for the purpose of producing an abortion upon a woman deemed to be pregnant, except to save her life. The reason and policy of the statute is to protect women and unborn babes from dangerous criminal practice, and to discourage secret immorality between the sexes and a vicious and craven custom amongst married pairs who wish to evade the responsibilities and burdens of rearing offspring. If physicians and surgeons may assist wives and mothers who have practiced feticide upon themselves, by giving them relief after the death of the fetus, the policy of the law will be defeated and the abortionist will have an easy way of evading detection and punishment. He will have only to instruct the woman in the first use of an instrument, and then operate upon the fetus under conditions thus produced, which indicate that it is dead, and, upon his own testimony that he believed it was dead, evade criminal liability. Or physicians may operate in pairs; one upon the request of the woman will examine in order to advise her if she is pregnant, or if the embryo be sound, and, as if by *41 chance, give the delicate touch to the membrane; and when inflammation and the purulent discharge ensue, the second will be consulted and find the conditions that will exonerate him from crime, if he complete the operation.
Third, a comparison of the decisions of our own . state, and of other states having similar statutes, shows that the better reason, if not the preponderance of judicial opinion, is averse to such an interpretation of the law, and is in the same trend with the sentiments of the text-writers. Redfield, C. J., gives an admirable exposition of the “reason of the law” on this phase of the subject in State v. Howard, 32 Vt., 380, 399. The court of appeals erred in overruling the common pleas for following this view of the law.
2. The next question is more difficult. We have, first, to deal with a twofold intent. Primarily the intent was to produce anesthesia. This was not criminal. Secondarily there is an inchoate or suspended intent, or a contingent purpose, to produce miscarriage if the condition of the patient would require it. These comprise one intent to one purpose.
The case is not analogous to that of the burglar who breaks and enters to steal, carrying a murderous weapon in his hand and intending to kill if necessary to make his escape. The breaking is with the intent to kill, though primarily the intent is to steal and not to kill unless the killing be necessary to escape: all one unlawful purpose. But here, if the doctor was giving the chloroform with the intent to discover whether it would be necessary to operate on the fetus, for the sake of the mother’s *42 health and life, but without any intent to operate unless the operation would be necessary to preserve her life, then he did not administer the chloroform with an unlawful intent, that is to say, with intent to do an unlawful act, but to do a lawful act if the condition of his patient required the act to be done.
On the other hand, if his purpose were to discover if the fetus was dead, and then to deliver the woman and complete the abortion, even though her life were not in danger, and if that were his fixed purpose when he gave her the chloroform, then the overt act of administering the drug was attended with the guilty intent, and when she died from the effect of the drug his crime was complete.
The accused is a physician in good and regular standing, and he seems to have testified with candor in his own defense. And he is sustained by other credible physicians of high standing and ability, so far as he proceeded in the treatment of the woman. The net result of the professional opinion is that whether it be necessary to remove the fetus to preserve the life of the mother, where the subjective and objective symptoms are as they were in this case, will depend upon a close, intimate and critical knowledge of the patient, which is to be obtained by the sort of examinations which he made. In short, he could not decide in her case whether it was necessary to operate without making the last examination, and it was proper to administer chloroform for the purpose of that examination, though ether would probably have been a safer anesthetic for her.
*43 Now, the accused did not explicitly state that he intended to operate if the fetus were dead, even if that were not necessary to the preservation of the life of the mother. On the other hand the state failed to show, to that degree of certainty which is required in a criminal case, that he intended to cause the miscarriage without regard to the life of the woman. The testimony, on review of the whole case, shows that he did not intend to do anything unless the fetus were dead; and whether, in that event, operation would be necessary would depend on the precise, particular conditions presented to the mind of the skilled practitioner upon a critical examination. Whether, if the fetus had been dead, he would have removed it, though the life of the mother were not in danger, is left to conjecture.
In this state of the proof the court of appeals found that the evidence was not sufficient to overcome the presumption of innocence, and reversed the conviction upon that ground.
We think this judgment of the court of appeals should be, and it is, affirmed. But the order to discharge the prisoner is reversed, because he was not entitled on the record to a directed verdict of acquittal, and he is therefore remanded to the trial court for further proceedings according to law.

Judgment, as modified, affirmed.

Johnson, Donahue and Wanamaker, JJ., concur. Nichols, C. J., and Shauck, J., not participating.