PEOPLE *v.* FRITCH.

1. CRIMINAL LAW — MANSLAUGHTER — EVIDENCE —VERBAL ACT— INTENT OF DECEASED—PHYSICIANS AND SURGEONS.

In a prosecution of a physician for manslaughter for performing the criminal operation prohibited by 3 Comp. Laws, § 11503, declarations made by decedent, an unmarried woman, that she was pregnant, that she intended to visit Detroit for the purpose of having an operation performed, that she purposed visiting respondent for such operation, and other conversations tending to show her condition and intent, were competent, whether as part of the *res gestæ* or as evidence of material facts.[1]

2. SAME—HEARSAY.

It was proper to show by a witness that deceased inquired the name of a doctor for such purpose and was referred by witness to respondent, it having been shown that the inquiry was made on her own account.

---

[1] As to homicide in commission of, or attempt to commit, abortion, see note in 63 L. R. A. 902.

3. SAME—OPINIONS—INCOMPETENT EVIDENCE.

Decedent's statement of her reason for asking concerning a physician, and witness' opinions and her statements as to matters she had heard about respondent, were inadmissible.

4. SAME—DECLARATIONS OF DECEASED—HEARSAY.

Declarations of decedent tending to show that respondent told deceased he would perform an abortion for $25, and that he made an appointment for the following day, were hearsay and incompetent.

5. SAME—CORPUS DELICTI.

In so far as testimony of decedent's intended visit and its purpose was competent, it furnished evidence, in connection with other proofs, of the body of the crime.

6. SAME—EXPERT AND OPINION EVIDENCE—HYPOTHETICAL QUESTIONS—PHYSICIANS AND SURGEONS.

It was error to permit the prosecution to ask of an expert medical witness, on the basis of enumerated facts and inferences, whether, in his opinion, a criminal operation had been performed on deceased.

7. SAME—MEDICAL TESTIMONY.

Nor should the prosecuting attorney have been permitted to include in the question facts which could not assist the medical expert in forming a scientific opinion and which were of non-scientific character, such as that bricks were placed in the sacks with portions of the body which were found, that the sacks were like others in the possession of respondent, that respondent carried the body to the place where it was discovered in an automobile, etc.

8. SAME—TRIAL—CHARGE.

And it was prejudicial error for the court to commend the profession of expert medical witness, in his charge to the jury, thereby emphasizing improperly the evidence on which the prosecution mainly depended.

9. SAME—PRESUMPTION OF INNOCENCE—BURDEN.

The following charge on the presumption of innocence is sustained as not misleading: "It is a cardinal and important rule of law of evidence that the defendant in a criminal trial is presumed innocent of the crime with which he is charged until his guilt is proved beyond a reasonable doubt. In civil cases, gentlemen of the jury, the burden of proof is generally upon the party who affirms the existence of facts necessary to make out his case. In criminal cases, however, the burden of proof is upon the prosecution to show that the

prisoner is guilty of committing the crime charged in the information, and the presumption of innocence fades out of the case when the testimony of the people establishes the guilt of the defendant beyond a reasonable doubt."

Error to the recorder's court of the city of Detroit; Phelan, J. Submitted November 17, 1911. (Docket No. 153.) Decided May 31, 1912.

George A. Fritch was convicted of manslaughter. Reversed.

*Hugh Shepherd*, Prosecuting Attorney, and *Fred H. Aldrich*, Assistant Prosecuting Attorney, for the people.

*Lodge & Brown*, for respondent.

It is alleged in the information that on the 27th of August, 1909, at the city of Detroit, the respondent—

" With force and arms in and upon one Maybelle Millman, in the peace of the people of the State of Michigan, then and there being, wilfully did make an assault and then and there wilfully did use and employ a certain instrument or instruments, the name or names of which are as yet unknown, and other means, the exact nature of which are as yet unknown, in and upon and about and within the body of the said Maybelle Millman, she, the said Maybelle Millman, being then and there a pregnant woman, with intent thereby to procure a miscarriage of her, the said Maybelle Millman, the same not being necessary to preserve the life of the said Maybelle Millman, and not having been advised by two physicians to be necessary for such purpose, and in consequence of the said assault made in the manner aforesaid and of the unlawful and wilful use and employment of the instrument or instruments, and other means, aforesaid, the said Maybelle Millman did then and there, to wit, on said 27th day of August, A. D. 1909, at the city of Detroit and in the county aforesaid, die; wherefore the said George A. Fritch, in manner and form as aforesaid, did kill and slay the said Maybelle Millman and did then and there commit manslaughter."

The unlawful act which it is claimed the respondent

was guilty of, and which resulted in the death of the young woman, is described in 3 Comp. Laws, section 11503, as follows:

"Every person who shall wilfully administer to any pregnant woman any medicine, drug, substance or thing whatever, or shall employ any instrument or other means whatever, with intent thereby to procure the miscarriage of any such woman, unless the same shall have been necessary to preserve the life of such woman, or shall have been advised by two physicians to be necessary for that purpose, shall, upon conviction, be punished by imprisonment in a county jail not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment."

The testimony produced on the part of the people tended to prove the following facts: On August 14, 1909, the person named in the information went from Ann Arbor, her home, to Detroit, where she visited and roomed with a friend, with whom she remained until August 27, 1909, and who upon the morning of that day last saw her alive. On September 6, 1909, her dismembered body was found in the water in the Detroit river and in Ecorse creek, a stream leading into that river, in three sacks, two of which also contained bricks; the sacks were like other sacks which at the time alleged in the information, and before and after that time, the respondent had in his possession or upon his premises, and the bricks were like bricks which were upon his premises. On the evening of August 27, 1909, the respondent procured the services of an automobile and driver, placed some bricks in the automobile, carried from his office and deposited therein three sacks, evidently containing some substance or matter, went with the automobile and driver to Ecorse creek and threw the sacks into the water. The body bore evidences of having been prepared for an operation by shaving the hair from the private parts and of attempts to restore vitality after collapse. On the night of the 26th of August, when deceased disrobed in her room, the hair usually growing upon the body was present. Deceased had formerly been

treated for some affection of, or trouble connected with, her heart. The deceased visited the office of respondent on the afternoon of August 26th, had an interview with him, and was seen at his office on the afternoon of August 27th, the day on which the crime is alleged to have been committed. The landlady of the house in which the deceased and her hostess roomed saw her during the forenoon of August 27th at her room. To both of these ladies the deceased stated that she was going to visit friends or relatives in the city, and the landlady was asked to direct her to a certain locality. The persons whom she said she intended to visit received no visit from her that day. Deceased supposed herself to be pregnant and had taken some medicine recommended to her for producing a miscarriage. The landlady who has been referred to found in the room occupied by the deceased a catheter lying back of the slop jar in a commode, and a bottle of extract of cotton root (the medicine above referred to) standing upon the top of a rather tall piece of furniture in the room, neither of which articles belonged to her or to the roommate of deceased.

The condition and appearance of certain portions of the body were described by medical men who conducted a *post mortem* and microscopical examination thereof. Certain hypothetical questions were asked medical men, those who made the observations and others, who, in answer thereto, expressed the opinion that the deceased was pregnant on August 27, 1909, and the further opinion that a criminal operation had been performed.

The respondent was a witness in his own behalf, and, admitting the visit of the deceased at his office on the afternoon of August 26, 1909, and an appointment to visit the office the next day, he denied that she kept the appointment or visited his office to his knowledge on August 27, 1909, and all guilty knowledge of the crime alleged. He introduced testimony tending to prove that deceased did not visit the office on August 27th, and of facts and circumstances which he claimed rendered it improbable, if

not impossible, that he could have performed an operation upon the deceased.

The witness Martha Henning, the intimate friend of the deceased, with whom she roomed while she was in Detroit, identified the body of deceased. She accompanied her on August 26, 1909, to the office of the respondent. She testified that she learned during the second week of the visit the purpose of deceased in making the visit, and that the purpose declared by deceased was to go to some doctor; that she thought she was pregnant and was going to find out for sure; that deceased also told the witness that she had been taking some medicine while in Ann Arbor for two weeks and inquired of witness if she knew any doctor. Concerning the visit of deceased with her to respondent's office, she testified that deceased called her up in the afternoon and asked her to go with her to the office; that she did go, stood outside but where she could look into the office and see the respondent while deceased was there.

" I seen Doctor Fritch at his desk and I seen her go in the door into the office. She was there just about probably 5 or 10 minutes; she was not in there very long. * * * She came out; I asked her what he said to her. He said she was to come the next day.

"*Q.* That would be Friday, the 27th?

"*A.* Friday, the 27th; then I asked her about his charges, and she said $25. Then she wanted to know where she could get the money to pay for it. ' Well,' I said, ' you cannot get it of me,' and I told her to get it of somebody whom she thought she could get it of, and she said she did not know who; she said she had made arrangements with him to pay so much every week.

"*Q.* She had made arrangements ?

"*A.* I could not say if she said she had made it or could make it. She said something about making arrangements. And I asked her if she was going the next day. She got kind of sore at me for not—

"*Q.* What did she say the arrangement was? * * *

"*A.* That he had told her to come—

"*Q.* The arrangements, what about the pay ?

"*A.* I don't know; she did not say much; she simply said that he said he charged $25.

"*Q.* Did she say anything about whether she could pay any part of it?

"*A.* She said she could pay him $10; then she would meet the rest of the payments afterwards.

"*Q.* What?

"*A.* She said she could make the rest of the payments afterwards.

"*Q.* What did she say, if anything, what he told her as to making the balance of the payments when she could?    *    *    *

"*A.* She could pay it whenever she had any money to send in to him, whatever she had she could send him.

"*Q.* Then she said she was to go back the next day?

"*A.* The next day. I asked her if she was going and she got kind of sore at me. She got kind of sore at me for not offering to give her any money. She said it was none of my business, but she had told me that she had an appointment with him the next day. There was nothing said that evening about it.

"*Q.* Where did you go that evening? Let me ask you if there was anything said about her eating?

"*A.* He told her not to eat anything.    *    *    *

"*Q.* Not to eat anything when?

"*A.* The next day, if she came down.

"*Q.* Didn't she eat anything at all for breakfast?

"*A.* Just a little—I don't know anything at all about breakfast, but she was to eat a light dinner.

"*Q.* Was she to eat at all?

"*A.* No, just a little bit.    *    *    *

"*Q.* You went home then, did you?

"*A.* Yes, we went home."

The witness Cora James, called by the people, testified that deceased called at the store where witness was employed, and there related what she asserted to be the troubles of a friend of hers."

" " Did you afterwards learn that it was not for some one else that she mentioned it?

"*A.* Yes, sir.    *    *    *

"*Q.* For what was she making inquiries of you?    *    *    *

"*A.* For a friend. She said she was in trouble, wanted to know if I knew anything that would help her. I

asked her how far along she was. She said she didn't know.

"*Q.* What particular thing was she wanting; what did she want to do?

"*A.* She wanted to know if I knew of any doctor, or anything, that would help her friend; just came in the store and we talked. She said she knew of a drug. I said I had heard of something; she went and got it and brought it back. I tasted it. It was the same as I had heard of—extract of cotton root bark. There was a friend of mine taking that at the same time. I did not learn from her whether she had been taking this before. She said she had heard of it in Ann Arbor.

"*Q.* You said she inquired about a doctor, she wanted to go to a doctor?

"*A.* Yes, sir.

"*Q.* Was she directed to some doctor?

"*A.* I told her I heard Dr. Fritch did such things.

"*Q.* Did you give her the address?

"*A.* She looked it up in the telephone directory in the store; I was beside her; I did not know where it was myself. I noticed that she got the right number, the right street. She finally took the address; it was on Washington boulevard.

"*Q.* Was she directed to that office?

"*A.* Yes, sir.

"*Q.* That was a few days before, you think, the fore part of the week?

"*A.* Probably three or four days before; something like that.

"*Q.* Anything said about paying for such an operation?

\*    \*    \*

"*A.* I asked her if she knew whether her friend had the money. She said, 'I don't know,' she says, 'but,' she says, 'I have $10 I will loan her.'

"*Q.* Do you know whether she had $10?

"*A.* I do. She opened her purse and I saw a $10 bill in it. That is all I saw in the purse."

Mignonette C. Messenger, a witness produced on the part of the people, testified that she saw the deceased at the office of respondent on the afternoon of August 27th and entered into conversation with her. The witness and the deceased were strangers.

"*Q*. What did she say she was doing in there; what did she say about going in Doctor Fritch's office ?

"*A*. She said I have only met him once, yesterday. I have an appointment with him today at 4 o'clock after the other patients have left. I offered to go in with her.

"*Q*. Anything said with reference to her bringing a friend, or why she did not bring a friend to go in with her ?

"*A*. Yes, I asked her why she did not bring a friend with her ?

"*Q*. Did you learn why ?

"*A*. She said because the doctor had told her not to tell any one she was coming there."

James McDonnell, a witness for the people, testified:

" I am chief of detectives and have occupied that position about 15 years. I know the defendant and have quite a number of years. I remember the first time he was arrested. I think he was arrested the day after the body was brought to the morgue. He was arrested the next time after some of the witnesses were sworn before the grand jury.

"*Q*. When he was arrested, was he given an opportunity to make any statements that he desired ?    *    *    *

"*A*. He was.

"*Q*. Was he told what had been said with reference to the case ?    *    *    *

"*A*. He was.

"*Q*. Did he make a statement ?

"*A*. He did not.    *    *    *

"*Q*. What did he say ?    *    *    *

"*A*. He said, 'Captain, I have nothing to say. On the advice of my counsel I have got nothing to say.'

"*Q*. Was that the answer that was made on both occasions?

"*A*. Yes, sir.    *    *    *

"*Q*. Do you remember whether he was confronted with Joe Leach ?    *    *    *

"*A*. He was.

"*Q*. What about his answers then ?    *    *    *

"*A*. Just the same."

William S. Grimes, a physician and surgeon, and in 1909 one of the county physicians of Wayne county, was a witness for the people and testified among other things

that, with Dr. Stapleton, another county physician, he made a *post mortem* examination of the remains of the deceased. After testifying to the condition in which he found the body, he was interrogated as follows:

"*Q.* I want to ask you a hypothetical question. Supposing that the uterus of this dead girl, Maybelle Millman, after her death, with the portion of the body containing it, had lain in Ecorse creek and Detroit river from the night of the 27th of August, 1909, to the 9th day of September, 1909, a period of 10 or 12 days, that it was then recovered and a *post mortem* examination was had upon it and the other portions of the body, which developed the following facts: An enlargement of the vagina, the cervix more or less dilated, and so that an ordinary metal probe about one-quarter inch in diameter could be passed without using any force, and a quarter inch glass probe could be passed through the outer to the inner os without force, and through the inner os into the uterus with very slight force, the uterus enlarged; two blood clots adherent to the posterior wall, inside of the uterus, a microscopical examination of the uterus showing deciduous cells; the hair which grows about the private parts being shaved off as if she had been prepared for an operation; the inside of the thighs and about the private parts were blistered; the tongue was protruding; the rectum dilated, which might indicate applications and endeavors to resuscitate a person in collapse; and in addition to this it appears from the proof in the case that the girl, just prior to the 27th of August, had passed two menstrual periods without menstruating; that she believed she was pregnant, and had used drugs, extract of cotton wood bark, to relieve herself of the pregnancy; had possessed a catheter, an instrument sometimes used to produce an abortion; had consulted her friends about her condition; was worried about it, and, upon the suggestion of one of her friends that the drug would bring her around and relieve her of her pregnancy, had procured and taken more extract of cotton root bark, but without the desired result; had consulted a physician, this defendant, Dr. George A. Fritch, and had made an appointment with him about an operation, and had told her friend that the physician, this defendant, had told her that he would charge her $25; that an arrangement had been agreed upon that she should pay $10 down, and the balance as she could; that she would come to him on the

following day, Friday, August 27th, in the afternoon. Taking all those facts together, what would you say, was the girl, beyond any reasonable doubt, pregnant on the 27th day of August, before her visit to the doctor ? "

To which he answered, "Yes." Also the following:

"*Q.* I ask you this question, another question: Supposing you add to the above facts that the girl's dead body had been dismembered, that is, cut into several parts or portions, and the various portions distributed and introduced into three sacks, the first sack containing the trunk or torso, that portion from the neck down to or near the navel; the second sack the head and legs below the knees; the third sack that portion from above the navel to just above the knees; that this dismembering of the body had been done, as indicated by every circumstance in the case, in the office of the physician this girl had consulted, this defendant; that, after placing these several portions of the body in the sacks, he carried them from his office about 9 o'clock at night, put them in an automobile, conveyed them to Ecorse creek between 9 and 11 o'clock at night, and, after putting two ordinary bricks in each of the first two sacks, threw them into the creek between the suburban railway bridge and the highway bridge, where the water was from 8 to 10 feet deep. Would those facts, in connection with the facts contained in the previous questions, especially the fact that there were clots in the uterus found at the *post mortem*, lead you to believe, and would they all tend together to indicate to you beyond any reasonable doubt, that there had been a criminal operation by the physician with whom the girl had made the appointment, and who afterwards thus dismembered and disposed of the body ?"

Upon objection, the court said:

" I want to save that question for a time.

"*Q.* I will ask another one: Supposing the *post mortem* examination exhibited the fact that the uterus was enlarged, the vagina enlarged, the cervix enlarged, the uterus empty, deciduous cells, blood clots in the uterus, would those, under all the circumstances and facts indicated in previous questions, indicate that there had been a criminal operation upon the girl, Maybelle Millman ?
* * *

"*A.* Yes.

"*Q.* Do all these facts stated in the several questions confirm you in a belief, fixed and settled, that this girl, Maybelle Millman, was pregnant on August 27, 1909, and that there had been a criminal operation that resulted in her death ?   *   *   *

"*A.* Yes, sir."

On cross-examination, the witness testified:

"I am giving my expert opinion here about something outside of this *post mortem* examination; I am giving my opinion on everything classed in that whole question. I am giving my opinion upon things that are not medical facts, too.   *   *   *   I did not understand Judge Van Zile to use the words ' beyond any reasonable doubt ' in a medical sense.   I did understand him to use them in a legal sense.   I am not a lawyer."

Substantially, the questions above set out and answered were repeated to the people's medical witnesses Stapleton, Walker, and Clark.   In interrogating the last two witnesses, the words "reasonable doubt" were eliminated from the question.   The first two answered each affirmatively, and Dr. Clark, in answer to the one which called for an opinion whether a criminal operation had been performed, said—

"With that condition, I should say that it showed a violent method of emptying the uterus."

Upon his cross-examination, Dr. Stapleton said:

"I am not able to say, from what I saw there on the *post mortem* examination that I made of this body, that this girl was pregnant, or that this girl had either performed herself, or had a criminal operation performed upon her—an abortion.   It has been necessary, in giving my opinion that she was pregnant, and that she had a criminal operation performed upon her, for me to take all these different hypothetical facts that you have just asked me about, and, without assuming those hypothetical facts to be true, I would not have answered as I did; not without taking everything into consideration.".

Upon the subject of these hypothetical questions, the court said to the jury:

"A word, gentlemen of the jury, in regard to the opinions of medical experts. In that connection, I charge you that the opinions of medical experts are to be considered by you in connection with all the other evidence in the case, but you are not bound to act upon them to the entire exclusion of all other testimony; taking into consideration these opinions, and giving them just weight, you are to determine for yourselves from the whole evidence whether the defendant is guilty of the crime charged. You are not to take for granted that the statements contained in the hypothetical questions which have been read to the several witnesses are true. Upon the contrary, you are to carefully examine the evidence, and from that determine what, if any, statements are true, and what, if any, are not true; but, should you find from the evidence that some material statements therein contained are not correct and that they are of such a character as to entirely destroy the reliability of the opinions based upon the hypothesis stated, you should not attach any weight whatever to opinions based thereon. You are to determine from the evidence what the real facts are, and whether they are correctly or not stated in the hypothetical question or questions. For, in law, gentlemen of the jury, an opinion based upon a hypothetical question, based upon a hypothesis wholly incorrectly assumed or incorrect in the material facts to such an extent as to impair the value of the opinion, has little or no weight upon the matters stated in such hypothetical questions and which are involved in the case."

With respect to the testimony of medical witnesses generally, the court said to the jury:

"But I now, gentlemen of the jury, call your attention to a different kind of testimony which is permitted by law, some of which we have heard in this case, its purpose being to aid you, with the other evidence, in arriving at a proper judgment as to whether Maybelle Millman, on the 27th day of August last, was pregnant or otherwise. In all fields dependent upon special knowledge, application and learning in any special branch of human activity, which is the result of deep thought and experiment, which has been handed down from generation to generation of workers in special branches of human labor, the evidence of skilled artisans and professional men therein is admitted in courts of justice to enlighten

the court and jury upon what may be trade craft or special knowledge of professional men, and on no class of man's work are there more frequent calls of this description than on the medical profession, and no profession, gentlemen of the jury, as a whole, does its duty more fully and with more dignity and honor in aiding courts of justice to render that evenhanded justice which the law commands shall be done. You have yourselves witnessed what study, skill, and practical knowledge has enabled the medical witnesses in this case to give their answers based upon the hypothetical questions asked them. It is clear that, as every man cannot be a skilled anatomist, in addition to his regular business, so, in trials of this description, gentlemen of the jury, where the crime has been committed, if you find from the evidence that a crime was committed, that, assuming certain facts to be true, the scientific result is very important as explaining what may be expected to result. Therefore, to meet this difficulty, the law permits what are known as hypothetical questions to be asked specially qualified witnesses, learned physicians, for instance, to obtain from them what we call opinion evidence; or, in other words, assuming certain facts to be true, what, in their opinion, would be the probable or certain result. The opinions of medical witnesses are to be considered by you in connection with all the positive and circumstantial evidence received. You should give this class of testimony just weight, to determine for your elves whether, from the evidence, the facts upon which the hypothetical questions are based have been proved, and, if not, then, as I before charged, the basis failing, the opinions based thereon are entitled to no weight. If, on the other hand, the people have proved the facts beyond a reasonable doubt, upon which the hypothetical questions are based, as being truly stated, and the opinions expressed thereon commend themselves to your honest judgment, then, gentlemen of the jury, such evidence is competent for your consideration as having a tendency to convince your minds as to whether this defendant is guilty of the crime which is charged by the people was the result of the defendant's unlawful act in procuring or attempting to procure an abortion upon the body of Maybelle Millman."

The court in his charge further said to the jury:

"Some comments have been made by counsel as to the

testimony given by Martha Henning as to what Maybelle Millman told her was her purpose in calling on Dr. Fritch, but our Supreme Court has laid down the rule that such testimony is admitted for the purpose of illuminating and characterizing an act which would otherwise appear only equivocal. If the mere statement that Maybelle Millman visited Dr. Fritch in his office, stood alone, her visit might or might not be entirely innocent; she might have gone to get a position or to have her eyes examined, or for a variety of innocent purposes which, without the cause or reason of the visit being explained, might be inferred or guessed at. But the testimony, if believed, as to what she said was her reason for calling on Dr. Fritch, fixes the purpose and character of her visit and reveals the history and nature of her illness; a history of her illness from the very beginning to the end, as far as can now be learned, was most proper and perfectly legitimate to prove the *corpus delicti* in this case."

The respondent being under cross-examination, the following occurred:

"*Q.* Do you know of anybody else that there is any proof against in this case?

"*Mr. Lodge:* Objected to as incompetent, irrelevant, and immaterial.

"*The Court:* No, I think it is a decidedly proper question. (Exception for defendant.)

"*A.* Mr. Van Zile, I am not running a detective bureau here in the city.

"*Q.* You cannot answer the question?

"*A.* I don't know of anybody or any clue or anything else.

"*Q.* You don't know; you have never heard of anybody, have you?

"*Mr. Lodge:* The same objection and exception.

"*A.* No. How would I hear of anybody?

"*Q.* I don't know. I was asking you if you did.

"*A.* No.

"*Mr. Lodge:* I move to strike it out.

"*A.* Only what the newspapers say.

"*The Court:* I think I will leave it stand. He is asking the witness, who is charged with this offense, whether he knows of anybody.

"*Mr. Lodge:* Anybody else that they have got any proof against.

" *Mr. Van Zile:* That who has got any proof against ? There is no such a thing as that in the question.

" *The Court:* I think I will leave it stand.   *   *   * Now, doctor, your counsel, in the opening of this case, said you were to bring some witnesses to show your own good reputation.   You heard that statement, didn't you ?

"*Mr. Lodge:* Don't answer that question.   Objected to as incompetent, irrelevant, and immaterial.

"*The Court:* No, I think I will let him answer the question.

"*Mr. Lodge:* Let me have an exception.   What difference does it make ?

"*The Court:* I don't know.   It is a statement that the prosecuting attorney claims you made to this jury.

"*Mr. Van Zile:* That is what he did.

"*Mr. Lodge:* The jury heard it, and he heard it.

"*The Court:* Don't make any difference, Mr. Lodge, at all, if he can say.   I don't know what the prosecuting attorney is basing his question on.   I am not reading his mind.

"*Mr. Lodge:* On my opening.

"*The Court:* I am not trying his case nor your case. I am only ruling here as to whether it is a proper question to ask this witness under the rule.

"*Mr. Lodge:* That is the point.   I claim it is not.   That is why I make my objection.   If you honor admits it, I would like an exception.

"*The Court:* Very well, you may have an exception. The witness may answer the question.

"*Q.* Did you hear Mr. Lodge, in his opening, make that statement ?

"*A.* Yes, sir.

"*Q.* You intended to do that, didn't you ?

"*Mr. Lodge:* Wait a minute.   Objected to as incompetent, irrelevant, and immaterial.   What difference does a party's intention as to offering proof have on a question of his guilt ?

"*Mr. Van Zile:* If your honor please, I will tell you what it has.

"*The Court:* I have already ruled, gentlemen—

"*Mr. Lodge:* Which way, may it please your honor ?

"*The Court:* Let us proceed with the trial.

"*Mr. Lodge:* Let us have an exception.

"*A.* My case was in my attorney's hands.

170 Mich.—18.

"*Q.* You intended to do that, didn't you?

"*Mr. Lodge:* The same objection.

"*Q.* Did you intend to have your attorney stand up before this jury, and make a statement in the case, and not follow it up with proof?

"*Mr. Lodge:* Objected to as incompetent, irrelevant, and immaterial; argumentative.

"*Q.* Did you intend to do that?

"*The Court:* Same ruling, and exception.

"*A.* I did not put the words in my attorney's mouth.

"*Q.* Did you have anything to do with the matter at all; did you know what was going to be said?

"*Mr. Lodge:* Same objection and exception.

"*The Court:* Same ruling.

"*A.* In a general way.

"*Q.* After that statement was made by your attorney to this jury carrying the idea that you were going to be put in here as an exceptionally good-charactered man, possibly after you heard him say that he was going to put your character in here by witnesses, why didn't you do it?

"*Mr. Lodge:* Same objection and exception. That certainly—

"*The Court:* Just a moment, Mr. Lodge, you have objected. Now I will rule on your objection without any speechmaking.

"*Mr. Lodge:* I take an exception to the statement of the court.

"*The Court:* You can have it.

"*Mr. Lodge:* I am not making a speech.

"*The Court:* You can have it. I am not going to have you making a long speech every time you object.

"*Mr. Lodge:* I take an exception to the statement of the court. I have a right to make my objection and give the reason for it.

"*The Court:* No, you have not anything of the kind. You make your objection, Mr. Lodge, and I have ruled on it. I have excluded the answer to the question.

"*Mr. Lodge:* Let me have an exception to the remarks of the court in excluding the answer.

"*The Court:* I have excluded the answer.

"*Mr. Lodge:* Excluded. I withdraw the exception to the admission of the answer.

"*The Court:* I excluded the answer to that question nearly three minutes ago.

"*Mr. Van Zile:* Did you say it was improper?

"*The Court:* No, I did not say it was improper.  I excluded it; that is the reason.

"*Mr. Van Zile:* Is the objection sustained?

"*The Court:* Yes.

"*A.* I testified in my direct examination that my practice was a general practice, taking care of everything that came along in the ordinary doctor's office.  I said I had paid a little more attention to the diseases of women, all diseases.

"*Q.* Have you paid somewhat of a specialty to diseases of women that might be caused by pregnancy?

"*Mr. Lodge:* Objected to as incompetent, irrelevant, and immaterial.

"*The Court:* No, I think he may answer the question. (Exception for the defendant.)

"*A.* Certainly.

"*Q.* Doctor, I will ask you this:  If the reason for your not putting in testimony of good character in this case was not this: that you knew that there could be plenty of proof put in here that you were an abortionist?

"*Mr. Lodge:* I take exception to the asking of the question.

"*Q.* And had that reputation?

"*Mr. Lodge:* I object to the question as incompetent, irrelevant, and immaterial, and I cite to your honor the case of the people against Lonsdale in which Philip T. Van Zile was attorney in the case and won in the Supreme Court on the ground that just such questions as that were erroneous.

"*Mr. Van Zile:* I beg pardon.  There is nothing in the case in that decision of that kind, and Mrs. Lonsdale never took the stand, was never cross-examined there.

"*The Court:* I told Mr. Lodge a minute ago—

"*Mr. Van Zile:* That is for the jury that my friend is making the statement.

"*Mr. Lodge:* I take an exception.

"*The Court:* There is only one way to try a lawsuit.

"*Mr. Lodge:* That is, you make an objection to questions you think are improper, and cite your reasons for it, and have the court rule on it, and not have such statements as that made by the prosecutor, that such statements are made for the jury.

"*The Court:* Are you through?

"*Mr. Lodge:* I am through now.

"*The Court:* If the counsel for the defendant made the

address he did for the benefit of the court in the *Lonsdale Case,* I wish to thank him.

" *Mr. Lodge:* You are quite welcome.

" *The Court:* I wish to thank the counsel. Counsel does not recall perhaps in that case Mrs. Lonsdale did not go upon the witness stand.

" *Mr. Lodge:* That don't make any difference as to this question, may it please your honor.

" *The Court:* Don't it? Now, Mr. Reporter, kindly read the question again. (Question read by the reporter.)

" *The Court:* You may answer the question. (Exception for the defendant.)

"*A.* No.

"*Q.* You answer, 'No.' Would that be within the term 'general practice' that you are engaged in ?

" *Mr. Lodge:* Same objection.

" *The Court:* Same ruling. (Exception for defendant.)

"*A.* Explain that to me.

"*Q.* You say you were in general practice of medicine. Would that be a part of the general practice of medicine, committing abortions ?

"*A.* No, sir.

"*Q.* It would not ?

"*A.* No, sir.

"*Q.* Would it be within the specialty, the diseases of women ?

"*A.* No, sir.

"*Q.* It is a fact, isn't it, doctor, that you have been engaged in that very thing, and within the time that this jury has been sitting here in your case ? (Objected to as incompetent, irrelevant, and immaterial.)

"*A.* It is not.

" *Mr. Lodge:* I take an exception to the question of the prosecutor. He knows now that such things as that are clearly immaterial and incompetent.

" *Mr. Van Zile:* You think he does ?

" *The Court:* The question I wish to impress upon the mind of counsel for defendant is that all that is necessary is to make his objection. The court will rule. I will exclude the latter part of the counsel's question, or anything subsequent to the filing of the information in this case, any of the defendant's acts subsequent to the filing of the information in this case, since the trial in this case.

" *Mr. Van Zile:* If your honor please, I can show that

he has continued doing that up to this very hour, and is in that practice.

" *Mr. Lodge:* I object to that statement. I take exception to that statement. It has no business to be made in the presence of the jury.

" *The Court:* That is a matter for this court to say, and not for you.

" *Mr. Lodge:* It is my duty to call it to the attention of the court.

" *The Court:* No, it is not. I rule upon the admissibility of the question asked, Mr. Lodge, not you. You make your objection.

" *Mr. Lodge:* There is no doubt about it. I am watching the record all the time; I am taking exceptions.

" *The Court:* I sincerely request that you be not calling the attention of the court—

" *Mr. Lodge:* It is my duty to call attention to what I think is improper; and Mr. Van Zile has no right to make that, in my estimation.

" *The Court:* Mr. Lodge, I want to tell you once for all, I want you to call the court's attention to your objection, and I want you to leave it there. I will rule in this case.

" *Mr. Lodge:* That is right; but I am watching this record, may it please your honor.

" *The Court:* You will find the ruling of the court here in the *Duponce Case.* Now, Mr. Reporter, will you kindly take and read the latter part of that question again ? (Last question read by reporter.)

" *The Court:* I hardly think that under the recent decisions you can ask that question in its entirety, if he has been engaged in that.

" *Mr. Van Zile:* I think, when counsel puts into this case that this man is engaged in the general practice of medicine, and talks to the jury, puts in proof to the jury with reference to what his practice has been, that I may follow that up and show what his practice has been.

" *The Court:* Yes, but I do not believe that you can ask—that you can show anything specific on the part of the defendant, Mr. Prosecuting Attorney, after the date of the filing of the information in this case. I believe, however, you have a right to ask those questions, if you understand they live prior to this case and prior to the filing of the information here. With that exception, I think it is a competent question to answer. I am quite sure it is

competent because of the recent opinions that bear that out."

The sixteenth request to charge preferred by respondent and refused, was evidently drawn in view of this cross-examination of respondent and was:

" The respondent is not called upon to prove how May-belle Millman came to her death nor is he called upon to prove who committed the act or acts which caused her death.   The sole question is whether respondent is guilty of causing her death in manner and form as charged by the people upon whom rests the burden of proving respondent guilty as charged."

Upon the subject of the presumption of the innocence of the accused, the charge was as follows:

"It is a cardinal and important rule of law of evidence that the defendant in a criminal trial is presumed innocent of the crime with which he is charged until his guilt is proved beyond a reasonable doubt.   In civil cases, gentlemen of the jury, the burden of proof is generally upon the party who affirms the existence of facts necessary to make out his case.   In criminal cases, however, the burden of proof is upon the prosecution to show that the prisoner is guilty of committing the crime charged in the information, and the presumption of innocence fades out of the case when the testimony of the people establishes the guilt of the defendant beyond a reasonable doubt."

Respondent was convicted and sentenced.

Ostrander, J. (*after stating the facts*).   The principal questions presented by the record and argued in the brief are:

(1) Was it competent to prove the declarations of the deceased to establish (*a*) her condition or supposed condition, and the purpose of her visit to Detroit; (*b*) what respondent said to her upon the occasion of her visit to him on August 26, 1909?

(2) If such testimony was competent for any purpose, was it competent to prove the *corpus delicti?*

(3) Was it competent for the people to prove that re-

spondent, after his arrest, was given an opportunity to make, and did not make, a statement ?

(4) Were the hypothetical questions propounded to the medical witnesses improper (a) because not calling for expert or medical opinion, (b) because embracing essentially the question which it was for the jury to answer ?

(5) Was the court in error in instructing the jury that they might determine to what extent untrue statements contained in the hypotheses of counsel for the people destroyed the reliability, or impaired the value, of the opinions based upon the hypotheses ?

(6) Was it error for the court to comment approvingly, but generally, upon the character and honor and learning of medical witnesses ?

(7) Was the instruction respecting the presumption of the innocence of respondent erroneous ?

(8) Was reversible error committed in the cross-examination of the respondent or by the conduct and statements of the prosecuting attorney ?

Complaint is otherwise made of the charge of the court and of refusals to charge as requested.

1. One issue of fact being whether the deceased was or was not pregnant, and the fact of her pregnancy being one which the prosecution was required to prove, two other facts, and each of them, namely, that the deceased had not menstruated for two months and that she supposed herself to be pregnant, if established, tended to prove the fact in issue. The fact that an unmarried woman supposes herself to be in such a condition proves that her conduct has been such that the condition may exist; it tends to prove some derangement or interruption of normal functions, the natural and possible, if not the necessary and actual, result of her previous conduct. No witness having knowledge thereof testified to the first fact, but only to the relation or narration thereof by the deceased. The other fact, which involves the consciousness or mental state of the deceased, no one but her could have knowledge of except as the fact was disclosed by her con-

duct and by what she said. It is contended that the testimony received to establish these evidentiary facts was hearsay and inadmissible.

The deceased visited the office of respondent and had an interview with him on the evening of August 26th and she again visited his office during the afternoon of August 27th. These visits, so far as she was concerned, and with respect to the investigation now being conducted, were innocent or sinister according to her purpose in making them. The principal reason for excluding oral hearsay evidence—testimony of narrations or statements made by a third party to the witness—is that the original speaker cannot be cross-examined.

"It is not requisite that the witness should have personal knowledge of the main fact in controversy, for this may not be provable by direct testimony, but only by inference from other facts shown to exist. But it is requisite that, whatever facts the witness may speak to, he should be confined to those lying in his own knowledge, whether they be things said or done, and should not testify from information given by others, however worthy of credit they may be. For it is found indispensable, as a test of truth and to the proper administration of justice, that every living witness should, if possible, be subjected to the ordeal of a cross-examination, that it may appear what were his powers of perception, his opportunities for observation, his attentiveness in observing, the strength of his recollection, and his disposition to speak the truth." 1 Greenleaf on Evidence (15th Ed.), § 98.

The testimony of declarations made by a person is not always hearsay nor within the rule excluding hearsay testimony. There is respectable authority supporting the contention that in this case the testimony should have been excluded. There is also authority sustaining in part the ruling of the trial court. It is unnecessary to attempt a classification of the various cases, a large number of which have been examined. I shall confine myself to brief references to such as announce what I conceive to be the applicable rule.

In our own State, in *People* v. *McDowell*, 63 Mich. 229

(30 N. W. 68), declarations of the deceased, made when she left home, as to where she was going and whom she proposed to visit, were held admissible.

In *State* v. *Hayward*, 62 Minn. 474 (65 N. W. 63), a murder case, a witness testified that, upon the day of her murder, she asked deceased to go with her to dinner, and received the reply that she could not because "she had a business engagement with Mr. Hayward." Of this the supreme court said:

"This statement forms a connected part of the evidence, and tends to characterize her subsequent acts and her departure on the fatal ride soon after she made the statement. This statement was not mere self-serving hearsay evidence, but a verbal act, just as relevant as would be evidence that prior to her departure she put on her cloak or hat."

In *State* v. *Howard*, 32 Vt. 380, a witness for the prosecution was asked the purpose of herself and her deceased sister in leaving home, and testified:

"I had some talk of going on a visit before I knew she was going. I and she supposed her to be pregnant, and she left Sutton to get an abortion procured, as was understood between us at the time we left."

Of this testimony, Chief Justice Redfield, speaking for the court, said:

"The declarations of Olive Ashe as to the purpose of the journey in going to the respondent's were properly admitted as part of the *res gestæ*. The mere act of going was equivocal; it might have been for professional advice and assistance. The declarations were of the same force as the act of going and were admissible as part of the act."

In *State* v. *Dickinson*, 41 Wis. 299, a witness was permitted to testify to declarations of the deceased to the effect that she understood or had found out that she was in a family way, had been to see defendant about it, had made an arrangement or bargain with defendant to perform an operation upon her, and was to visit him at a time stated for the purpose of an abortion. It was held:

" Upon the authorities, her intent or purpose in going there might be shown by her declarations then made or previously made; because such declarations became a part of the *res gestæ*. For it is evident the declarations were connected with the act of her going to the defendant; were expressive of the character, motive, or object of her conduct; that they are to be regarded 'as verbal acts indicating a present purpose or intention, and therefore are admitted in proof like any other material facts.'"

In *Commonwealth* v. *Felch,* 132 Mass. 22, the statement of facts contains the following: The defendant called one Hughes as a witness and offered to prove by her that, in the month of June next preceding the time of the alleged offense, Mary (the deceased) told her that she was pregnant by one Edward Titcomb, and that if Titcomb did not perform an operation to procure a miscarriage, or get some one to do so, she should perform the operation herself with a lead pencil. It appeared that said declarations neither accompanied nor were explanatory of any act then done by her. The testimony was excluded. The court, affirming the ruling, said that the declaration accompanied no act, gave character to no transaction.

" There existed no one of the circumstances which sometimes in law are deemed a sanction equivalent to the ordinary sanction of an oath. It is mere recital."

In *Commonwealth* v. *Trefethen,* 157 Mass. 180 (31 N. E. 961, 24 L. R. A. 235), the defendant was charged with murder by drowning. He offered to prove in his defense that deceased had stated on the day before her death by drowning that she was five months pregnant with child and had come to consult the witness (a medium) as to what to do, adding, during the interview, that she was going to drown herself. The testimony was excluded. Overruling the trial judge, it is said:

"On principle, therefore, we think it clear that, when evidence of the declarations of a person is introduced solely for the purpose of showing what the state of mind or intention of that person was at the time the declara-

tions were made, the declarations are to be regarded as acts from which the state of mind or intention may be inferred in the same manner as from the appearance of the person or his behavior, or his actions generally.  In the present case the declaration, evidence of which was offered, contained nothing in the nature of narrative, and was significant only as showing the state of mind or intention of the deceased."

The decision in *Commonwealth* v. *Felch* is commented on in part as follows:

" The decision of the court that no question of pedigree was involved in the case, and that for the purpose of proving that Titcomb was the father of the child the evidence was hearsay and inadmissible, is undoubtedly correct. But the counsel for the defendant in that case also contended that evidence of this declaration was admissible to show an intention in the mind of the deceased to perform the operation, and that this was material in connection with the evidence that the operation was one which she might have performed.  There are some passages in the latter part of the opinion which perhaps tend to show that this argument did not wholly escape the mind of the justice who wrote it, but this particular aspect of the evidence is certainly not carefully considered, and no cases are cited, and the whole discussion in the opinion is such that this point in the determination of the case might not have received the attention it deserved.  Upon a re-examination of the question, we are of opinion that, under the circumstances shown in *Commonwealth* v. *Felch*, a part of the evidence should have been admitted for the purpose of showing the intention in the mind of the deceased, and that to this extent that decision must be overruled."

See, also, *Hunter* v. *State*, 40 N. J. Law, 495; 1 Greenleaf on Evidence (15th Ed.), § 108, and notes; *Inness* v. *Railroad Co.*, 168 Mass. 433 (47 N. E. 193); *State* v. *Power*, 24 Wash. 34 (63 Pac. 1112, 63 L. R. A. 902); *Mutual Life Ins. Co.* v. *Hillmon*, 145 U S. 285 (12 Sup. Ct. 909).

It will be noticed that in some of the opinions referred to the term *res gestœ*, in others the term verbal act, and perhaps in others other terms are employed as indicative

of a rule, or an exception to a rule, permitting the introduction of the testimony. Nevertheless, it is clear that in most of the cases cited, the testimony was regarded not as hearsay and admitted under some exception to the rule which excludes hearsay testimony, but as original evidence. Original evidence of the condition of deceased as she supposed it to be, of her intention and of the purpose of her visits to respondent, was furnished by testimony of her declarations. Standing alone, this testimony did not tend to prove the guilt of respondent. But it was most convincing evidence, if the narrator was believed, that deceased proposed to be the willing participant in a criminal abortion, if it was found to be necessary. Her purpose, intention, and willingness, in connection with her acts in calling upon respondent, were clearly material. That the declarations were made upon the occasion of her first, and a day before her second, visit is a fact to be considered, but, as it appears that no examination of her person was made at the first visit, and it is admitted that an appointment was made for a second visit, it must be assumed that her supposed condition and her purpose remained the same. But the statements of deceased after her first visit were not declarations but were recitals and conclusions from statements made by respondent to deceased and by her repeated to the witness who repeated them to the jury. It is said in the brief for the people that this testimony was admissible as part of the *res gestæ*. The ruling admitting the testimony of the declarations of the deceased as to her condition and purpose is sustained, not upon the ground that those declarations were part of the *res gestæ*, although it may be entirely proper to so designate them, but because they were original evidence of material facts. The testimony now being considered is clearly hearsay. As hearsay it is accompanied by none of the assurances usually supposed to accompany declarations made in expectancy of death or during or immediately before or after the vital act inquired about, as an affray or bodily injury. The general rule excludes it.

*People* v. *Aikin,* 66 Mich. 460 (33 N. W. 821, 11 Am. St. Rep. 512); *People* v. *Davis,* 56 N. Y. 95. The conclusion reached is that the court below was in error in admitting testimony of the statements made by deceased after she left the office of respondent upon her first visit there.

Assuming that the witness Cora James learned, as she testified she did, that the inquiries made of her by deceased were made on her own account, her testimony concerning the inquiries was properly admitted for reasons already given. It was proper to show by this witness that, in connection with her other statements, the deceased desired to be referred to a doctor and was referred by her to respondent.

But why she did so, though perhaps the reason is inferable, she should not have been permitted to state. Her opinions and what she had heard concerning the respondent were not competent. I do not find that the specific objection was made or that the court was asked particularly to strike out the objectionable testimony.

The testimony of the witness Messenger that she saw deceased at respondent's office on the afternoon of August 27th was of course competent. The testimony that deceased told her she had an appointment with respondent is made unimportant by respondent's admission that she did have an appointment. Her testimony concerning what deceased said the respondent had said was hearsay and should not have been received. If the admission of hearsay testimony was the only error made to appear, I should seriously consider whether, in view of all the testimony, it could be said that the error was without prejudice. But, as will be pointed out, there is other error requiring a reversal.

2. The testimony admissible under the foregoing rulings, when considered with all of the testimony in the case, was competent to prove the *corpus delicti.* It tended to establish the nature of the act which one of the actors

desired to have performed and the other is charged with having committed.

3. It is possible that I do not understand the significance of the testimony of the witness McDonnell hereinbefore set out. He was called in rebuttal. Respondent had testified that he made no statement when arrested, to which fact the attention of the prosecuting attorney was directed, who made the reply, "In a way, and I want to show that he has not admitted it as it was." The complaint made about it in the brief for respondent is that respondent gave as a reason for not making a statement the fact that he had not been permitted by the police to see his attorney, in whose absence he declined to talk, and that testimony of one of his attorneys, who was produced as a witness both before and after the witness McDonnell gave his testimony, in contradiction of McDonnell, was excluded; and it is said that if McDonnell's testimony was received, as it was, testimony contradicting it should have been received. If what the prosecuting attorney meant by his rejoinder was that respondent refused to make any statement by advice of, and not in the enforced absence of, his attorney, it would seem that either McDonnell's testimony should have been refused or that the testimony of respondent's attorney should have been received. But I do not find that objection was made when the prosecuting attorney asked respondent, in cross-examination, about the opportunity given him to make, and his refusal to make, a statement.

4, 5, 6. The late Mr. Justice CAMPBELL, delivering the opinion of this court in *Evans* v. *People*, 12 Mich. 27, 34, used the following language, stating two important principles of the law of evidence applicable in the case at bar:

"It is not always easy to determine the propriety of receiving or rejecting testimony concerning matters involving, apparently to a greater or less extent, medical or other scientific investigation. There are many cases where it is difficult to determine whether the facts to be

examined are to be considered beyond the range of ordinary intelligence. And the decisions are by no means clear or satisfactory upon the distinctions. The principles on which the authorities rest are more consistent than the attempts to apply them.

"The primary rule, concerning all evidence, is, that personal knowledge of such facts as a court or jury may be called upon to consider, should be required of all witnesses, where it is attainable.

"It is also an elementary rule that, where the court or jury can make their own deductions, they shall not be made by those testifying. In all cases, therefore, where it is possible to inform the jury fully enough to enable them to dispense with the opinions or deductions of witnesses from things noticed by themselves, or described by others, such opinions or deductions should not usually be received. But experience has shown that many cases exist, in which it is impossible, by any description, however graphic, to explain things so as to enable any one but the witness himself to see or comprehend them, as they would have been seen or comprehended could the jury have occupied his position of observation. In such cases, the witness must give his own impressions and conclusions, or his narrative is useless; adding, however, as full explanations as the nature of the case will admit, so that his capacity and truthfulness may be tested as far as practicable."

After giving some examples, he adds:

"In all these cases the witness is allowed to testify to a result, because, without such evidence, the jury cannot be supposed able to arrive at a knowledge of it, and therefore such aid is indispensable."

One of the principles enunciated is that the testimony of such witnesses is dispensed with whenever the point is reached at which the tribunal is being told that which it is itself entirely equipped to determine without the witness' aid. 3 Wigmore on Evidence, § 1918. In the same opinion Mr. Justice CAMPBELL states the rule, well enough known, but not always observed, that, when a scientific witness testifies to matters within the comprehension of ordinary witnesses, he stands on the same footing with them as to all such testimony, and, as to such

matters, can only give his opinions where any other observer might do so. It does not require argument to prove that no medical witness called in the case at bar should have been asked for or permitted to give the opinion that a criminal operation had been performed. To say that in this case any operation must have been criminal does not meet the objection. It was the duty and province of the court, not that of expert witnesses, to advise the jury concerning the facts necessary to establish a crime.

The second hypothetical question, set out in the statement of facts herein, called upon the witness to state who, in his opinion, committed the criminal act, and, by necessary inference, from all data supplied by the question itself, called upon the witness to state, in substance and effect, that respondent was guilty as charged. The court interposed and the question was not answered. But the hypothetical question first above set out is little less objectionable. Undoubtedly, it was competent to include in the premises for an expert opinion the fact that the girl supposed herself to be pregnant, having passed two monthly periods, because that fact, like a statement of it made by the girl as patient to the witness as her physician, might properly be considered. So all the evidence afforded by observation of the body of the deceased, considered with respect to the probable time when she died and the immersion of the body in water, should have been included in the premises stated. But how is it possible for a scientific opinion in the case to be aided by the facts that bricks were placed in the sacks with portions of the body, that deceased had taken cotton root, possessed a catheter, had made an appointment with respondent about an operation upon terms stated, that the body had been carried in an automobile from respondent's office to Ecorse creek, that her body was dismembered in the office of the physician consulted by her? It was to data and observations impossible to lay before the jury and be comprehended by them, and such connecting and incidental data as afforded a basis for scientific opinion and deduction, that the ex-

perts should have been confined. The objections to the questions here stated were made by counsel for respondent and were overruled. That the error was prejudicial to respondent must be conceded. These witnesses, whose opinions were rested in large part upon nonscientific data which the jury was perfectly able to comprehend and estimate, whose answers to the questions could not well have been other than those which were expected and received, were particularly accredited by the court in the charge. I do not mean to intimate that in a proper case the opinion of a witness may not be based upon all of the testimony, when it is undisputed, nor that it is impossible to conceive of a state of facts used as the basis for opinion, one or more of which may be untrue or not proven, and the opinion still have value. I assume that the form of question used in this case suggested the instruction that, although some facts stated therein were regarded as not established, the opinion might nevertheless have value. But I cannot conceive that the value of a scientific opinion may properly be determined by a jury as they find the data upon which the opinion is based material or not material to the conclusion expressed by the witness.

Portions of the charge of the court commendatory of the medical profession have been set out. Such remarks are always made by the trial judge at the risk of consequences not intended. I have already called attention to the fact that in this case the medical witnesses were called upon to give opinions based upon improper premises. As the case stood when the charge was delivered, I think what was said about the medical gentlemen, however much it may have been deserved, was calculated to prejudice the respondent, because the case for the people was in substance contained in the questions asked medical witnesses.

7. I doubt if the jury, listening to the entire charge, received the wrong impression from that portion of it which refers to the presumed innocence of the accused.

8. The record affords abundant evidence of a spirited contest of counsel and of zeal on the part of the prosecution which was not always tempered with discretion. The respondent in a criminal case, who offers himself as a witness in his own behalf, may be asked upon his cross-examination to answer any question calling for material testimony which in the case of any other witness would be legitimate cross-examination. *People* v. *Dupounce*, 133 Mich. 1 (94 N. W. 388, 103 Am. St. Rep. 435, 2 Am. & Eng. Ann. Cas. 246).

The statement of the prosecuting attorney that he could show that respondent had continued the practice of causing abortions to the very hour of his examination, and that he was then in the practice, is not defensible, and in the brief for the people is not defended. It is said, however, and is true, that no motion was made to strike out the particular statement or to instruct the jury not to consider it. But the principal complaint made in respondent's brief is that by the conduct of the prosecuting attorney and the attitude of the court, indicated in part by the excerpts from the record hereinbefore set out, respondent was placed at disadvantage and the defense made for him was discredited. The precise condition is not likely to arise again, and, as the case must go down for a new trial, the assignments of error last referred to and others based upon the charge and refusals to charge are not considered.

For the errors pointed out, this court is required to reverse the judgment of the trial court, set aside the conviction of respondent, and award a new trial. Respondent will be surrendered to the custody of the sheriff of Wayne county.

MCALVAY, BLAIR, STONE, and BIRD, JJ., concurred.