THOMAS *vs.* THE STATE OF GEORGIA.

1. The jury commissioners are the proper judges of the qualifications of citizens to be placed on the jury lists of the country. That witnesses sworn on the trial think that certain names should have been on the list, and that few colored men were selected (the defendant being colored) is no ground for a challenge to the array in a criminal case.

2. Under direction of the court in a criminal case, the solicitor-general may administer the oath to witnesses.

3. On a trial for murder it appeared that the defendant and deceased were living together as husband and wife; that the deceased was jealous of his attentions to another woman, and had quarreled with him about the latter; that on the night of the homicide she left her house, saying as she went: "There are two persons down the alley; I think it is Harp (defendant) and his sweetheart; I will go and see;" that she went, but never returned; and that the next day she, was found murdered near where she expected to find defendant: *Held*, that such statements by her were admissible as part of the *res gestæ*.

4. A witness who examined a stick habitually used by the defendant shortly after the killing and while it had fresh stains upon it, might testify that such stains looked like blood.

5. A stick used by a defendant charged with murder, and left by him shortly after the crime was committed, bearing upon it stains apparently of blood, was admissible in evidence.

6. A dead body found with a knife thrust across the throat and breast, sufficient to have caused death, and with no signs of accident or suicide about it, is sufficient to prove the *corpus delicti* of murder.

7. The verdict is supported by the evidence.

Criminal Law. Jurors. Evidence. Witness. Practice in Superior Court. New Trial. Before Judge SIMMONS. . Bibb Superior Court. April Term, 1881.

Thomas was indicted for the murder of one Nancy Dykes, *alias* Puss Edge. On the trial the following facts, in brief, appeared from the testimony:

The defendant and deceased had lived together as husband and wife for a considerable length of time, and he staid almost nightly at her house. She became jealous of his attentions to another woman, and quarrels ensued, in the course of which he struck her and threatened to kill her. On the night of the homicide he had not returned home up to bed time, since early in the evening. She looked out of the house, and saw two people standing in an alley which ran near by. She said, "Yonder stand two persons at the corner of the lot; it looks like Harp Thomas and his sweetheart, I think; and I am going to see if it is them, and am coming back right away to the house." She went towards the couple, who separated and moved off in opposite directions. About the same time a witness testified to hearing defendant and deceased (at least he felt quite confident it was they) talking in angry tones in the alley. Defendant stated to a witness that night that he had separated from his wife (meaning the deceased). He did not return home that night, but went to the house of another woman, where he sat before the fire and nodded. She told him to lie down with the children, but did not know whether he did so, as she went to sleep leaving him sitting there, and when she woke early next morning he was putting on his shoes. He went to work unusually early next morning, without going home and without breakfast, dressed too in other than his usual working garb. A stick which he left at the house where he staid showed stains apparently of blood. The deceased never returned to her house after leaving it as stated above. Next morning she was found dead a short distance down the alley

with her throat cut and a contusion on the side of her head, as though she had been struck.

The jury found the defendant guilty, and recommended that he be imprisoned for life. He moved for a new trial, on the following among other grounds:

(1.) Because the court overruled a challenge to the array of jurors, on the ground that many names of citizens were not in the jury box that should be there, and that the names of only very few colored men were on the jury list. (Affidavits *pro* and *con* were produced.)

(2.) Because the solicitor-general was allowed to swear the state's witnesses and place them on the stand, over objections of defendant's counsel.

(3.) Because the court allowed a witness, over objection of defendant's counsel to testify to what deceased said just before leaving her house, as set out in the evidence above.

(4.) Because the court allowed a witness who found the defendant's stick in the house where he had staid the night of the murder, it being found the next day, to testify that it had stains upon it which looked like blood, the witness not being an expert.

(5.) Because the court admitted the stick itself in evidence.

(6.) Because there was no proof of the *corpus delicti*.

(7.) Because the verdict was contrary to law and evidence.

The motion was overruled, and defendant excepted.

F. J. M. DALY, for plaintiff in error.

CLIFFORD ANDERSON, attorney-general; JNO. L. HARDEMAN, solicitor-general, for the state.

JACKSON, Chief Justice.

The defendant was convicted of murder on circumstantial evidence and sentenced, under the verdict of the jury,

Thomas *vs.* The State.

to the penitentiary for life. A motion was made for a new trial, it was denied and its denial on all the grounds taken in the motion is the error assigned.

1. It being in proof that the commissioners for the selection of traverse jurors, as intelligent and upright citizens, acted honestly and according to law, and their integrity being conceded by defendant, the challenge to the array, based apparently upon the fact that but few colored men were selected and some, colored and white, were omitted who in the judgment of witnesses should have been on the list, was properly overruled. It is the judgment of the commissioners which, under the constitution and laws of this state, controls in the selection of grand and petit jurors, and not the opinion of witnesses sworn on the trial of a cause.

2. The solicitor-general, as the organ of the court and under its direction, "time whereof the memory of man runneth not to the contrary," has sworn the witnesses for the state and for the defense; and there has hardly ever been a legal conviction in Georgia, if that officer, by order of the judge in open court, had not the legal power to administer oaths to those witnesses. It is the common law of this state, sanctioned by a practice ever since its independence, and to rule it not to be law would be to open the doors of the penitentiary and to convict her judges and sheriffs of murder in many cases. There was no error, therefore, in overruling the objection to that officer's administering the oath provided by law to the witnesses in the case on trial.

3. The sayings of the murdered woman on the night of the homicide when in the act of leaving the house to which she never returned, and a short time before the homicide, that "there are two persons down the alley; I think it is Harp and his sweetheart; I will go down and see," were admissible as part of the *res gestæ*, which is the transaction which began in her leaving the house in search of the prisoner and culminated in her assassination where she ex-

pected to find him. He was living with her as his wife, had beaten her on account of jealousy of this woman called by her his sweetheart, and her sayings just as she left the house were part of the act of leaving, and thus part of the transaction. The Code of this state declares that " declarations accompanying an act, or so nearly connected therewith in time as to be free from all suspicion of device or after-thought, are admissible in evidence as part of the *res gestæ.*" This woman was dead; there could be no after-thought; what suspicion of device can arise in reference to this saying of hers in this case? The remark accompanied her act in leaving and her purpose to see the defendant on an errand of jealous anger; it was so near the fatal rencontre as to preclude the thought of plan or device to utter a falsehood. It was admissible on both branches of the rule expressed so clearly in the statute. Code, §3773; see also 5 *Ga.*, 85; 45 *Ib.*, 644; 64 *Ib.*, 374; *Brady vs. Parker*, this term; 1 Crim. Law Mag., 64. The objection was based somewhat on the expression "I think," as to the identity of the defendant; but identity is matter of opinion, especially at night, and the opinion of identity is strengthened by long intimacy, and more especially such intimacy as exists between man and woman in the intimate relation existing between the deceased and defendant. See Wharton's Ev., p. 461, note, p. 511.

4. A stick left at a house the night of the homicide, and shortly after the deceased left her house to follow defendant as she said, had the appearance of blood upon it. The witness stated that "it looked like blood to him;" this was objected to and admitted. It was competent for the witness to say that the stain had that look to him. The fact that he handled the stick and examined it when the mark was fresh, was enough to allow his opinion to go to the jury. The appearance of a thing is a fact, particularly such a thing as blood stain. Most people are familiar with it, and may state how it looked to them when fresh. So the appearance of a pistol was held admissible

and competent evidence to base a charge upon in 56 *Ga.*, 113. Its appearance shortly after it was alleged that it had been used was the issue of admissibility there.

5. Objection was made to the admission of the stick for examination by the jury. The same case, 56 *Ga.*, 113, ruled the pistol admissible, and that ruling covers the point here, and cases might be multiplied to the same point. Bloody clothing, bloody knives, are always held to be admissible; why not a bloody stick used that night by the defendant and left at the house where he spent the night?

6. The dead body with the knife thrust across the neck and breast, enough to cause death, are proofs sufficient to show the *corpus delicti.* The body in death and the criminal agency in causing it are the two elements that make the *corpus delicti.* The body found and identified, the throat cut, the fact that there was no sign of suicide or accident, are ample to prove the *corpus delicti.*

7. The issue was, who did the act that made the homicide? The jury found that the defendant did it. Is there legal evidence to sustain the finding? That is the sole remaining ground, though subdivided into several specifications. It is conceded that the charge is unexceptionable. It is unexcepted to.

The evidence is all circumstantial, yet it points steadily to the prisoner as the criminal actor in the deed of blood. The finger posts direct the searcher for truth nowhere else. There is no motive for another to perpetrate the deed. He was tired of her, and she followed in jealousy his attentions to another woman. This had made him angry to the extent of severely beating her before more than once, and he had threatened to kill her. With the woman of whom she was jealous, he passed down the alley, and she followed. The woman left and defendant and deceased talked angrily together, and there or near there her body was found the next day. That silent but never perjured witness, his stick, with its finger prints of blood, was left at the house where he spent the night. There

he sat, a culprit who could not sleep, because conscience was awake and drove sleep away; and there, from the woman's testimony at whose house he spent the night, he probably sat all night. The next morning, much earlier than usual, and without a morsel of breakfast, he is at his place of work. He does not return to the home which he knew was deserted forever by her with whom he lived in adultery, that night, nor does hunger lead him there for his usual breakfast the next morning, for he knows that the hands that had cooked it for him there were stiff in death and could cook no more. He has no witness to explain this unusual conduct, nor does he in his statement explain it to the satisfaction of impartial justice, though mercy may plead his cause. On the contrary, that statement leads him into antagonism with more than one assured fact, and does not in the mind of the jurors who tried him, or the judge who sentenced him, raise a reasonable doubt of his guilt. All that the mercy which should ever temper justice could do, the jury have done for him. The death penalty is lifted from its impending fall upon his head, and he lives in the penitentiary for life, to suffer that milder penalty which the jury have affixed to his crime. We do not find in the record anything which authorizes us to interfere.

Judgment affirmed.