### PEOPLE *v.* ATWOOD.

1. WITNESSES — PRIVILEGED COMMUNICATIONS — PROBATE JUDGES — STATUTES—CRIMINAL LAW—ABORTION.

In a prosecution for using an instrument with intent to produce a miscarriage, where the court, upon request of the prosecutor, entered orders for the probate judge and clerk to produce the records and testify to the marriage of respondent and deceased, celebrated by said judge in

conformity with Act No. 180, Pub. Acts 1897, as amended by Act No. 232, Pub. Acts 1899, which provide that all - knowledge of any facts coming to the judge or his deputies shall be privileged communications, and that such records shall be open to inspection only upon written order of the circuit judge, such orders did not authorize either officer to state communications and facts received in confidence and privileged by the law.

2. EVIDENCE—REVERSIBLE ERROR—APPEAL AND ERROR.

Where the facts shown by the record were otherwise proved, or admitted by respondent, its introduction was not reversible error.

3. SAME—PROBATE JUDGE—PRIVILEGED COMMUNICATIONS.

Where the probate clerk and judge testified as to conversations with, and statements of, respondent before the marriage, their evidence was not confined to the subjects indicated in the orders, and was prejudicial, notwithstanding that said marriage was admitted and otherwise proved, and that respondent admitted he was the father of the child, and was at the time unwilling to marry its mother.

4. SAME — PRIVILEGED COMMUNICATIONS — WAIVER — OBJECTION — APPEAL AND ERROR.

Where no proper objection was made in the court below that respondent had a privilege which was being violated by the admission of such testimony, and the only objection made in this court is that such orders could not lawfully be made upon the application of the prosecuting attorney, respondent is *held* to have waived the privilege.

5. CRIMINAL LAW—ABORTION—EVIDENCE—HEARSAY—INFERENCES.

Where the people had proved that deceased was pregnant, that an abortion had been committed, and that it caused her death, and where the relations of respondent and deceased supported an inference that he knew her condition, that she would not have an operation performed without his knowledge, and that he was cognizant of the crime, evidence that on the night she left her home and remained away she seemed in good health and spirits, and said that she was going to meet respondent, was admissible as verbal acts accompanying her going away, and whether they truthfully explained her conduct and purpose was for the jury.

Exceptions before sentence from Ottawa; Cross, J. Submitted April 22, 1915. (Docket No. 117.) Decided September 28, 1915. Rehearing denied December 22, 1915.

Morris Atwood was convicted of using an instrument with intent to procure a miscarriage. Affirmed.

, *Louis H. Osterhous,* Prosecuting Attorney, for the people.

*Smedley & Linsey,* for respondent.

OSTRANDER, J.     Respondent was, with another, charged with, and upon his separate trial was convicted of, the offense of employing an instrument, or instruments, name or names and exact nature thereof unknown, and other means, the exact nature of which is unknown, in and upon the body of Zelma Atwood, she being pregnant, etc., etc., with intent to procure a miscarriage, in consequence of which the said Zelma Atwood died, on or about October 21, 1913. The crime is alleged to have been committed on or about October 21, 1913, at the township of Blendon, in Ottawa county. A motion for a new trial was denied. The motion was based in part upon alleged newly discovered evidence. Many exceptions were taken during the trial. Those relied upon are stated in the brief for respondent as follows:

"(1) Admission of evidence:

"(a) Court erred in allowing witnesses Guyola Hammond, Ralph Lowing, and Eliza Lowing, over objection and exception of respondent's counsel, to testify as to what Zelma Atwood said on the evening she left, and refusing to strike out this testimony upon motion.

"(b) Court erred in allowing witness Agnes Frieswyck, over objection and exception of respondent's counsel, to testify as to what Zelma Atwood said about going for a walk with Morris, and that Morris was out waiting for her.

"(c) Court erred in permitting witnesses George Norcross, probate clerk, and Clark Higbee, probate judge, over objection and exception of respondent's counsel, to testify in relation to the marriage of respondent and Zelma Hammond, and what was said and done by these parties on that occasion, and the admission in evidence of the files of probate court with reference to this marriage, and the refusal to strike out this evidence on motion.

"(d) Court erred in allowing respondent, over the objection and exception of his counsel, to answer the question as to the parentage of the child born in 1912, and what took place at the probate court at the time of the marriage.

"(2) Motion to direct verdict:

"(a) It was error for the court not to direct a verdict of not guilty for respondent for the reasons stated in the motion.

"(3) Errors in the charge:

"(a) Respondent's first request to charge directing the jury to return a verdict of not guilty should have been given.

"(4) Argument of prosecuting attorney:

"(a) It was error for the prosecuting attorney to make the argument with reference to the *Bert Tibbits Case*, and the court to allow the same to stand over the objection and exception of respondent's counsel.

"(5) Motion for new trial should have been granted:

"(a) Because the verdict was against the great weight of evidence.

"(b) Because of newly discovered evidence.

"(c) Because the people failed to prove the respondent guilty beyond a reasonable doubt as a matter of law.

"(d) Because respondent is innocent of the charge made against him."

Zelma Atwood was 33 years old. She had for some years been employed as a domestic in the city of Grand Rapids, but from some time in April, 1912, had lived with her mother, Eliza Lowing, in Blendon township aforesaid. She had two brothers and two married sisters, a daughter, and other relatives. Leaving home

on Tuesday, October 21, 1913, to call upon a married daughter, Mrs. Lowing, at the request of Zelma, took with her and placed in the Atwood mail box an envelope addressed to respondent. Returning in the evening, she found Zelma there, who left the house at about 8:30 o'clock with some dishes which she said she would carry to a neighbor, a Mrs. Frieswyck. She was dressed in a brown suit. She went to Mrs. Frieswyck's house at a time fixed as between 8 and 8:30 o'clock, stayed a very few moments—six or eight—and went away. No person has testified to having thereafter seen her alive.

The Atwood house is about three-fourths of a mile from the Lowing house. Across the road from it, and south, is a small wood lot. The father and mother of respondent were absent upon a visit to New York. Respondent and a brother—corespondent in the information—were living at the Atwood home alone. Nothing was heard from Zelma by her relatives on Wednesday or on Thursday, and on Friday her body was found by Frank Atwood in the wood lot, hanging to a sapling by a rope tied short around her neck. Her back was towards the tree, her feet some 5 inches from the ground, a block of stove wood near her feet. She wore a tight-fitting hat, a suit of brown, a coat, and skirt and waist under the coat. She had on a corset, corset waist, underclothing, shoes and stockings, black cotton gloves. The dress, or waist, opened at the back, and was fastened with hooks and eyes. In the front there were hooks and eyes fastening the upper to the lower part of the waist, and on the right side it was partly open, some fastenings were gone, and a pocketbook or small hand bag was found inside the waist. She had on no rubbers, and her shoes were clean. In the hand bag were three handkerchiefs, one soiled, a bow of velvet and pin, a belt like the dress, a comb, drinking cup, button hook, toothbrush, paper, and en-

velopes. There was also a letter in an envelope, addressed to her mother, sealed and stamped. It was dated October 21st, and read:

"Dear mother and all: I am off for good and you need not look for me as I will not be around here. You will not find [that is spelled f-i-n-e] me, but don't blame Morris. That trouble we had a year or so, I am in the same fix now with the same feller as before. Morris is a straight feller, you cannot blame him that I take this course. Ever, daughter         ZELMA."

It is conceded that it was written by Zelma. The outer clothing was somewhat moist; the underclothing was orderly, unsoiled, and dry. It had rained Tuesday night, and during Wednesday afternoon there had been a fall of rain, snow, and sleet. The weather cleared during that afternoon.

The testimony tended to prove that she had not died of strangulation, but that the body had been hung up after death; that she had been pregnant and had aborted. The physical examination did not disclose whether an abortion was produced by drugs, instruments, or other means, nor whether it was performed by herself or another.

It is the theory of the people that a medical man or midwife performed a criminal operation upon Zelma at the Atwood home, by procurement of respondent; that death ensued from shock or from loss of blood resulting from the operation; that her body was concealed for some time, probably until Thursday night or Friday morning, when it was taken by respondent and his brother to the timber lot and hung to the tree where and as it was found. The motive for performing or securing performance of an abortion is found in the facts that respondent and Zelma were husband and wife, although this was not known to respondent's family, nor generally; that he was responsible for her condition and had been the father of a child previously

born, that he did not wish, at least not presently, to acknowledge the long-concealed relationship, and if it was further concealed he would appear to the community to be the father of a bastard. Opportunity is found in the fact that his father and mother were absent from home, and he and his brother only occupied the house from Tuesday night until after the body was discovered. Testimony was introduced which, with the inferences drawn therefrom by the people, sustain this theory. Respondent denied having seen Zelma Tuesday night or thereafter and all knowledge of the circumstances which led to her death and the disposition of her body. The testimony of respondent's brother generally supports that of respondent. With this statement we may proceed to examine the exceptions relied upon.

1. Before the people's case was closed, testimony was given by several witnesses to the effect that they did not know until after the body was discovered that respondent and Zelma were married. Others had testified, without objection, that they knew they were married. Her mother had testified that Zelma's first husband was named Hammond, by whom before marriage she became pregnant, who married her after he had been arrested, and then deserted her. His child, a girl, was a witness at the trial. Afterwards, in March, 1909, Zelma had another baby, by what father is not disclosed. A third child was born in March, 1912, at the Michigan Home for Girls. Later it was given away, or "bound out." In Zelma's family it was understood that respondent was father of the last child.

To prove the marriage of respondent and Zelma, the people called the probate clerk, the probate judge, and produced certain files and records of the probate office. Two papers from the files, an application for license to marry, and a marriage license and certificate, being offered in evidence, were objected to, "on the grounds

that we admit Morris married her, and therefore it is not necessary, and I don't think the contents of those affidavits ought to be read into the record as long as we admit that." They were objected to as incompetent. The prosecuting attorney did not read the affidavit. The papers were admitted for the purpose of establishing the fact of a marriage, and from them the prosecuting attorney informed the jury as follows:

"The application is made under Act No. 180 of the Laws of Michigan, as amended by the Public Acts of 1892, Act No. 232. The application for the license is signed by Morris Atwood, and was subscribed and sworn to by him on April 19, 1912, before Clark E. Higbee, judge of probate, giving the name of the groom as Morris Atwood, age 37, residence, Blendon township, and the name of the bride as Zelma Hammond, age 33, residence, Grand Rapids, Mich. The marriage license and certificate included a copy of Atwood's affidavit and application for the license, the order of the judge of probate, made upon the same day that the marriage was performed, and designating John T. Husted, a minister of the gospel, of Grand Rapids, Mich., to perform the marriage ceremony, and includes this certificate of marriage: 'I hereby certify that Morris Atwood and Zelma Hammond were joined in marriage by me at Grand Rapids, Kent county, Mich., on the 19th day of April, 1912, in the presence of George S. Norcross, of Grand Rapids, and John T. Hayes, of Grand Rapids, as witnesses. J. T. Husted, Pastor of Wallin Congregational Church.' "

The articles of adoption of the child were offered and received over objection to prove the respondent's acknowledgment that he was father of the child.

To the testimony of the probate clerk and judge, in which were rehearsed conversations with and statements of respondent before the marriage, various objections were made. One was the general one that it was incompetent; another, stated with the motion to strike out the testimony of the clerk, was that the law does not permit him to divulge such matters except

upon order of the court. An order had been made upon the petition of the prosecuting attorney applying to the probate judge only. The court, upon request of the prosecuting attorney, after the objection aforesaid was made, permitted an order to be entered applying to both the judge and clerk. Respondent excepted. The order was entered. To the testimony of the probate judge, the objection was:

"Incompetent, contrary to public policy. These people are married now, husband and wife, and any conversation in regard to the sexual intercourse before or after marriage is incompetent."

Act No. 180, Public Acts of 1897, is entitled "An act to provide for the protection of the reputation and good name of certain persons." As amended by Act No. 232, Pub. Acts 1899, it empowers the probate judge of each county, and makes it his duty, to issue, without publicity, a marriage license and to celebrate marriage in certain cases. It provides that all knowledge of any facts coming to the judge or his deputies shall be deemed to be privileged communications, and any violation of confidence a misdemeanor.

"Such file in the probate court, and the duplicate and record thereof in the office of the secretary of State, shall be open to inspection only upon the written order of the judge of any circuit or the Supreme Court of this State, and only for such use as is designated in such order. Such order shall be made only upon the written request of the person or persons who were so married, or when necessary to the protection of property rights arising from or affected by such marriage." Section 3.

Assuming that the license and marriage might have been proved by the record, upon the order of the court, the order could properly go no further. Neither of the orders entered purports to authorize either officer to state communications and facts received in confidence and privileged by the law.

It is said that the marriage was admitted and otherwise proved, and the fact that respondent was the father of the child and was at the time unwilling to marry its mother was testified to by him. Consequently, it is argued, the error, if one was committed, was harmless. The testimony was not confined to the indicated subjects, and was, beyond question, prejudicial to respondent.

In this court counsel for respondent urge that the orders referred to could not be lawfully made upon the application of the prosecuting attorney. No such point was made at the trial. Indeed, one of the objections made was based upon the fact that as to the probate clerk no order had been entered. And it is not asserted in this court, and was not in the court below, that respondent had a privilege which was being violated. What the record showed was otherwise proved or admitted, and therefore its introduction was not reversible error. The testimony of the witnesses as to matters not appearing of record, as to admissions and statements made by respondent, would undoubtedly have been excluded upon the objection that whatever respondent had said was privileged. No such objection was made, nor is it made in this court. If the privilege is his, respondent may waive it. Upon this branch of the case the exception must be overruled.

2. The people's witnesses, Guyola Hammond, Ralph and Elgie Lowing, Agnes Frieswyck, and Mrs. Lowing, were permitted to state what deceased said on the evening she was last seen by them alive. The testimony of Guyola Hammond, daughter of deceased (and that of the Lowing boys was substantially the same), was:

"*Q.* What did you hear your mother say, if anything, * * * about where she was going and what she was going to do? * * *

"*The Court:* Fix the time.

"*Q.* As near as you can tell, about what time was it when you heard them talking?

"*A.* About supper time; I don't know just what time it was. I didn't notice. My grandma had been away, and she didn't come home until almost dark. I couldn't tell just what time it was.

"*The Court:* How long after that did she leave?

"*A.* I don't just remember. I think she left about 8 or a little after. I don't know how long it was before they were talking. * * * I heard her say something about going to Grand Rapids, and that she was going to be married.

"*Q.* Just what did she say about it—about when and where she was going and who she was going with, and all about it?

"*A.* I don't just remember all she said. I know something about she was going to Grand Rapids to be married, is all I remember.

"*Q.* Did she say when she was going and who she was going with?

"*A.* I think I understood her to say she was going with Morris.

"*Q.* And when?

"*A.* That night; they were going to Grand Rapids. * * * My grandma told her she didn't want her to go alone. She said not—she was not; that Morris was going with her."

Mrs. Lowing testified:

"*Q.* What, if anything, did Zelma say that evening about where she was going and what she was going to do?

"*A.* She told me she was going to Grand Rapids. * * *

"*Q.* Who did she say she was going to Grand Rapids with, and what did she say she was going to Grand Rapids for? * * *

"*A.* She said she was going with Morris Atwood.

"*Q.* For what?

"*A.* They were going to be married.

"*Q.* And at what time and place was, or did she say, she was to meet Morris?

"*A.* He was to meet her at 8 o'clock.

"*Q.* Where?

"*A.* At the house.

"*Q.* At your house?

"*A.* Yes, sir. When she came downstairs she was dressed in a brown suit. She did not seem to be excited or nervous that evening. She was quite jolly and jovial, the same as usual. Morris did not come to the house to meet her. She left the house about half past 8, as near as I can remember. * * *

"*Q.* Just tell us what she said about the time she left the house?

"*A.* She said she would go to Mrs. Frieswyck's, and if she met Morris—if she didn't meet Morris, she would be right back, but 'if I do meet him, you will know we have gone.' Mrs. Frieswyck lives between our house and the Atwood house."

Mrs. Frieswyck testified:

"I remember Zelma Hammond or Zelma Atwood coming to my house on Tuesday evening of October 21st. It was between 8 and half past. Zelma brought some dishes back. She came into the kitchen, where I was busy. One side of the kitchen is facing the road. Zelma had on what I might call a brown or tan suit. She had on a blue velvet cap and some ragged gloves. She had on some button shoes. She stayed perhaps six or eight minutes. I don't know just exactly; not very long I know. * * *

"*Q.* What did she say about where she was going and whom she was going to see?

"*A.* She said she was going for a walk with Morris.

"*Q.* Did she say where Morris was?

"*A.* She said he was out waiting for her."

The objection made to receiving the testimony of Guyola Hammond was that it was—

"incompetent and irrelevant. The respondent was not present. He cannot be bound by it."

Before the question was finally answered, the objection was repeated in the following language:

"We object to the question and answer for the reason that it is hearsay, and that it is purely narrative statement, and for the further reason that the prosecutor

knows that no statement that this witness is about to make can be connected up with the respondent and that the respondent was not present. * * * It appears from the examination taken before the justice of. the peace that the statement about to be made by the witness cannot be connected up with the respondent in any way, and that is known to the court and also known to the prosecuting attorney at the present time."

To the testimony of Mrs. Frieswyck the objection first above noted was entered. To the testimony of Ralph Lowing the objection made was:

"I object to that as incompetent, for the reason, as stated before, that the respondent was not present, and that the prosecutor does not propose to make any connection between the conversation and anything that the respondent did; that is, he does not propose to show that Morris did go with her to Grand Rapids to get married or anything else, and he does not propose to show that Morris was seen with her that night, and therefore it is incompetent, and not a connected story."

To the testimony of Elgie Lowing and Mrs. Lowing the objection first above stated was made. I find in the record no statement of the purpose for which the testimony was offered, no ruling upon the subject of its limitations or effect. No request to charge concerning its legitimate purpose appears to have been preferred, and no reference to it is made in the charge. What use was made of it in argument we cannot know. Generally, the prosecuting attorney says of this testimony:

"There surely can be no question but that this testimony was admissible for the purposes for which it was offered and the purposes for which it was used. These purposes were not to show that deceased actually went to Grand Rapids to be married, or that she was intending and planning to have an abortion performed, or that an abortion was performed. The declarations in question were not proof of any one of these three things, and no one but respondent's counsel ever sug-

gested that they might be so considered, or were so considered. The testimony was offered, admitted, and used as evidence of verbal acts explanatory of and characterizing the act of deceased in going away from home, as original evidence of material facts showing the state of mind and intention of deceased, and as part of the *res gestæ*. So offered, received, and considered, these declarations of deceased were competent evidence, and the court did not err in admitting proof of them.

"The state of mind and intention of deceased were especially important in this case, because it is one of the claims of respondent's counsel that she had herself planned and arranged for the abortion before leaving her home. And counsel admit the testimony in question to have been competent for the purpose of showing her intent and purpose in leaving."

And he cites *People* v. *McDowell,* 63 Mich. 229 (30 N. W. 68) ; *People* v. *Fritch,* 170 Mich. 258 (136 N. W. 493) ; *Martin* v. *State,* 77 Ala. 1; *Harris* v. *State,* 96 Ala. 24 (11 South. 255) ; *Thomas* v. *State,* 67 Ga. 460; *Warrick* v. *State,* 125 Ga. 133 (53 S. E. 1027) ; *State* v. *Peffers,* 80 Iowa, 580 (46 N. W. 662) ; *State* v. *Winner,* 17 Kan. 298; *Commonwealth* v. *Trefethen,* 157 Mass. 180 (31 N. E. 961, 24 L. R. A. 235) ; *State* v. *Hayward,* 62 Minn. 474 (65 N. W. 63) ; *State* v. *Thompson,* 132 Mo. 301, 321 (34 S. W. 31) ; *Id.,* 141 Mo. 408 (42 S. W. 949) ; *Hunter* v. *State,* 40 N. J. Law, 495; *Kirby* v. *State,* 7 Yerg. (Tenn.) 259; *State* v. *Mortensen,* 26 Utah, 312 (73 Pac. 562, 633) ; *State* v. *Goodrich,* 19 Vt. 116 (47 Am. Dec. 676) ; *State* v. *Howard,* 32 Vt. 380; *Cluverius* v. *Commonwealth,* 81 Va. 787; *Tilley* v. *Commonwealth,* 89 Va. 136 (15 S. E. 526) ; *State* v. *Power,* 24 Wash. 34 (63 Pac. 1112, 63 L. R. A. 902) ; *State* v. *Dickinson,* 41 Wis. 299; *United States* v. *Nardello,* 15 D. C. (4 Mackey) 503.

For respondent the proposition is advanced that:

"Before declarations of deceased made under these circumstances can be admitted as competent evidence,

188 Mich.—4.

it must appear: *First,* that the thing she said she was going to do was actuallv done; *second,* the respondent must be connected up with the statement by some other proof; *third,* the declarations cannot relate to any understanding or arrangement deceased had with respondent."

Again, with reference to the testimony of Mrs. Frieswyck, it is said:

"We submit this testimony was clearly incompetent because it was hearsay; and it was clearly prejudicial because the jury was allowed to use this for the purpose of connecting respondent with the disappearance of deceased. The process of reasoning on the part of the jury could only be this: Zelma said she was going for a walk with Morris; that Morris was waiting for her. We conclude Zelma did go for a walk with Morris. Morris was out waiting for Zelma, and therefore Morris committed the abortion because he took a walk with Zelma and had the opportunity. * * * There is a further reason why this testimony was incompetent. The alleged declarations made by deceased were made by the wife of respondent. If living, she would not be a competent witness against him without his consent."

Having proven by other testimony that Zelma Atwood was at the time pregnant, that an abortion had been committed, that it caused her death, the people were bound to prove that respondent was in some way responsible for the crime and for its result. That Zelma left her home on Tuesday evening and remained away, and that when going away she seemed in good health and good spirits, were relevant facts. But in trying to reconstruct for the tribunal of inquiry the *res gestæ,* the things which occurred from the time she left home until her body was found, it was necessary, to some extent, to employ inferences. No witness could be produced who saw the alleged crime committed or the steps taken to dispose of the baby; none who saw respondent with her or who knew where she

went. The rope, which came from respondent's barn, the piece of wood at her feet when she was discovered, the place where the body was found, and the fact that it was discovered by the brother of the respondent soon after knowledge had come that the authorities would probably conduct, or had begun, an inquiry, were circumstances tending to support the inference that the crime was committed in the immediate neighborhood. The relations of respondent and Zelma supporting an inference that he knew her condition and that she would not likely submit to having an operation performed without his knowledge, the manner in which the rope which suspended her body was tied, the apparent indifference of respondent when informed of the disappearance of Zelma and asked to aid in finding her, are all circumstances supporting an inference that respondent was at least cognizant of the crime. We are of opinion that it was competent to prove her utterances made when she was leaving home, and the neighbor's home, on Tuesday evening, not as evidence of the fact that she met respondent, but as evidence of her intention to meet him and explanatory of her purpose in going away. Her utterances were in the nature of verbal acts accompanying the act of going away. Whether they truthfully explained her conduct and purpose was a question for the jury. The testimony being competent, the exceptions taken to the ruling admitting it must be overruled.

With respect to other exceptions the record has been carefully examined, with the result that we are unable to sustain any of them. We have especially considered whether the verdict was palpably against the great weight of evidence. This is one of a class of cases in which the result may be questioned, especially by one who reads the record and had not the advantage of seeing and hearing the witnesses. That there is testimony strongly pointing to respondent as a participant

in committing the crime charged, cannot be doubted. We cannot say that the court erred in refusing a new trial.

The exceptions are overruled, and the court advised to proceed to judgment.

We cannot pass without some notice matter found in the briefs; that in the brief for the people being largely in reply to the statements in the original brief for respondent. For example, the court is informed by respondent's counsel that:

"An examination was had in justice court where respondent was bound over for trial. All this testimony was before the circuit judge, and before starting on the trial of the case the question as to the admissibility of this evidence was taken up by the circuit judge, prosecuting attorney, and respondent's counsel, and the prosecuting attorney then contended that, unless the same was admitted, he would have no case to submit to the jury, because without this testimony the evidence would fail to connect the respondent with the commission of the offense."

Again:

"The jurymen were mostly of Holland nationality—moral men who believe in the solemnity of the marriage ceremony. They were filled with religious passions and prejudices, and immediately they stigmatized respondent as a bad man because he married a woman and did not live with her as her husband. The prosecuting attorney knew too well the men before whom the case was being tried, and never failed to inject in the case details of the secret marriage; the name and adoption of the bastard child; the fact they had not lived together after marriage. In addition, the prosecuting attorney in his closing argument, by inference at least, held out the hope to the jury that respondent, if convicted, would make a confession as in the *Bert Tibbits Case*."

After quoting from the argument of the prosecuting attorney, it is said:

"This might be the natural and logical reasoning of this jury, and if we were to go outside the record, we can say we know it was at least with one juror."

On the other hand, we are informed that a minority only of the jurors were of Holland descent, and that "Hollanders make mighty good, careful, and conscientious jurors, anyway." There is more of this. We are told that:

"Not one of them entered upon the trial of the case with any prejudice or any opinion," etc.

We cannot suppose that it is believed that the court should be influenced by such statements, even though made by eminent counsel. It must have been supposed that the court might be influenced by them.

BROOKE, C. J., and KUHN, STONE, BIRD, MOORE, and STEERE, JJ., concurred.

This was one of the causes assigned to the late Justice MCALVAY, undetermined at the time of his death.